**CLARK EQUIPMENT COMPANY,**
Plaintiff–Appellee,

v.

**The DIAL CORPORATION,**
Defendant–Appellant.

No. 93–3018.

United States Court of Appeals,
Seventh Circuit.

Argued March 31, 1994.

Decided June 16, 1994.

Rehearing and Suggestion for Rehearing
En Banc Denied Aug. 18, 1994.

Fred Schulz (argued), Susan L. Walker, Wildman, Harrold, Allen & Dixon, Chicago, IL, for plaintiff-appellee.

Shayle P. Fox, William H. Barrett, Paul A. Olsen (argued), Fox & Grove, Chicago, IL, for defendant-appellant.

Before POSNER, Chief Judge, and CUMMINGS and EASTERBROOK, Circuit Judges.

POSNER, Chief Judge.

This appeal requires us to consider the meaning of products liability. Back in 1971, Clark Equipment Company purchased from Armour and Company the principal assets of the Construction Equipment Division of an Armour subsidiary, Baldwin–Lima–Hamilton Corporation. The division (we'll call it "Lima") manufactured Lima construction cranes. These are, of course, highly durable products, and Clark was naturally concerned about the possibility of being made a defendant in products liability suits arising from defective cranes manufactured long before its purchase of Lima's assets. Armour for its part was naturally concerned about the possibility of being sued for defects in cranes manufactured and sold after the sale of the assets to Crane. The parties therefore decided to include in the contract of sale a mutual indemnification provision. Armour agreed to indemnify Clark for any legal expense (including judgments) "arising out of the conduct of the business of [Lima] ... prior to the Closing Date" of the sale of Lima's assets to Clark and Clark agreed to indemnify Armour for any legal expense (including judgments) "arising out of the conduct of the business of [Lima] ... on and after the Closing Date." Further, and critically, the parties agreed that for the purpose of the indemnification provision "product liability claims shall be deemed to arise out of the conduct of the business of [Lima] by the party selling the equipment or part to which the claim pertains." At the time Armour was a subsidiary of Greyhound Corporation, now called Dial Corporation. Dial is the defendant in this case, having assumed Armour's liabilities to Clark.

In 1986 John Morrie, a construction worker who had been injured when a crane manufactured by Lima and sold to Morrie's employer prior to the acquisition of Lima's assets by Clark dropped a load of steel on him, brought a diversity suit in the federal district court in New Hampshire against Clark and Armour. The first three counts were standard products liability claims and did not differentiate between the two defendants. The fourth count (misnumbered Count V) was against Clark alone and charged that by virtue of a "continuity of the relationship between Clark Equipment Company and the

customers of [Lima]," Clark had a duty to warn those customers of any defect it knew about in a Lima crane. The fifth count (Count VI, naturally) alleged that by virtue of having "direct and specific knowledge of a defective and dangerous condition" of the Lima crane that had injured Morrie and that Clark "had serviced," Clark had a duty to warn people who it knew or should have known would be operating the crane in its defective condition. Both defendants moved for summary judgment. The suit against Armour (that is, the three counts that had named it) was dismissed; as the parent of the corporation that had manufactured the crane, rather than the manufacturer itself, Armour was not liable for the defective condition of the crane. All but Count VI against Clark was dismissed too, on the ground that Clark was not liable as a successor to the tortfeasor. Count VI the judge retained because the Supreme Court of New Hampshire had "acknowledged the possibility of duty to warn as a separate factor 'concomitant with the general duty of the manufacturer,'" quoting *Thibault v. Sears, Roebuck & Co.*, 118 N.H. 802, 395 A.2d 843, 847 (1978). The judge noted that "duty to warn as a base for liability because of negligence by a successor corporation to the customers of the predecessor 'is still in the developmental stage,'" quoting *Polius v. Clark Equipment Co.*, 802 F.2d 75, 84 (3d Cir.1986). He added that "courts adopting the doctrine weigh factors like succession to service contracts, coverage of a particular machine by a contract, service of that machine by the successor corporation, and successor's knowledge of the defect and of the machine owner's location."

After the district judge in the New Hampshire suit issued his opinion, Clark settled Morrie's claim against it (now down to Count VI) for $450,000. The load of steel, which was suspended from the crane's hoist, had fallen on Morrie because the crane's hoist brake pedal had not been properly engaged. According to Morrie's evidence, Clark knew that the brake pedal on the model was unsafe yet failed to notify dealers or owners, even though it routinely mailed service bulletins to its dealers for distribution to owners of Lima cranes containing maintenance and safety advice on the cranes whether they had been sold before or after 1971. After the settlement in Morrie's case, Clark began to include a prominent warning about the brake pedal in its service bulletins and to supply its dealers with warning decals for distribution to the owners of this model of Lima crane.

The present suit, a diversity breach of contract suit, was brought by Clark against Dial to obtain indemnification for the $450,000 that Clark paid in settlement of Morrie's suit, plus modest attorney's fees incurred in the defense and settlement of that count. The district judge held that since the crane had been manufactured before 1971, the accident to Morrie was the responsibility of Dial, so he gave judgment for Clark, and Dial appeals.

It is plain from the indemnification provision that if Count VI of Morrie's complaint, the only count that was still alive when Clark settled with Morrie, is a "product liability" claim within the meaning of the provision, then Dial, as Armour's successor, is, as between itself and Clark, liable for the cost of defending and then settling Morrie's suit. The rest of the counts plainly were products liability counts, and the crane on which Morrie was injured had been sold before the closing date of the sale of Lima's assets to Clark. Dial argues that Count VI could not have been a products liability claim, since it was not made against the manufacturer or seller of the crane. The crane had been manufactured and sold by Armour's Lima subsidiary before Clark had come on the scene. Clark was not responsible for the defective or dangerous condition of the crane, but only for failing to warn about that condition.

The indemnification provision does not define "product liability." But the contract of which the provision is a part recites that the contract is to be construed in accordance with Michigan law, and a Michigan case, *Pelc v. Bendix Machine Tool Corp.*, 111 Mich. App. 343, 314 N.W.2d 614, 621 (1981), appears to endorse the "successor's duty to warn" theory that was articulated in the New Hampshire district court's opinion, in *Polius*,

and in a number of other cases, illustrated in this circuit by *Leannais v. Cincinnati, Inc.,* 565 F.2d 437, 441–42 (7th Cir.1977), and *Travis v. Harris Corp.,* 565 F.2d 443, 448–49 (7th Cir.1977), and in other courts by *Florom v. Elliott Mfg.,* 867 F.2d 570, 577, on rehearing, 879 F.2d 801 (10th Cir.1989) (per curiam), and *Harris v. T.I., Inc.,* 243 Va. 63, 413 S.E.2d 605, 610 (1992). Like these other cases, the Michigan case was decided long after 1971. But we take it that the parties intended the term "product liability" in the indemnification provision to mean whatever it might mean when indemnification was sought, rather than requiring an historical inquiry into the state of the law in 1971. An historical inquiry would yield indeterminate results. There was no duty to warn about someone else's product back in 1971, so the historical question would be whether, had there been such a duty, it would have been considered a duty founded on notions of products liability or some other sort of duty. We have not the faintest idea how to conduct such an inquiry.

■ When the manufacturer or seller of a product fails to warn customers of a hidden defect, we have a standard products liability suit. At the other extreme, in the two states (neither of them Michigan) in which bystanders have a duty to rescue people in distress (provided they can do so without undue danger to themselves), Vt.Stat.Ann. tit. 12, § 519; Minn.Stat.Ann. § 604.05, if someone happened to know that the load of steel was about to fall on Morrie's head because the hoist brake pedal was not engaged and he was sued for failing to warn Morrie the suit obviously would not be a products liability suit. Morrie's actual suit is somewhere in between. But we think it is closer to the products liability end of the spectrum and therefore that the district judge was right to give judgment for Clark. We have to consider *why* courts have begun to impose liability in cases such as Morrie's Count VI. A sale of assets used to manufacture durable, potentially dangerous equipment creates a serious break in the chain of responsibility for warning the owners or operators of such equipment about latent defects and dangers. The general rule is that a sale of assets, as distinct from a corporate merger, does not transfer any actual or potential liabilities of the seller to the buyer. *Chaveriat v. Williams Pipe Line Co.,* 11 F.3d 1420, 1424–26 (7th Cir.1993). So when Clark bought the assets of the Construction Equipment Division from Armour's subsidiary it did not acquire any liability for defects in the cranes that the division had manufactured and sold. The subsidiary retained liability, and it is a mystery why Morrie didn't sue it; but perhaps it no longer exists. Even if it existed or was suable, it would be in a very poor position to take precautions against liability, as by sending warnings to customers about potential defects in the cranes that it had manufactured. For not being in the business any more, it would rapidly lose touch with dealers and customers and so would neither receive information about safety problems concerning the cranes that it had sold nor be in a position to disseminate such information, as well as information about possible warnings or other corrective measures, to dealers and owners.

The situation would be different if the seller had retained the service end of the business, but in this case it had not. Clark, as the buyer of the business, was in as good a position to monitor and correct safety problems of Lima cranes whenever they had been manufactured and sold as the seller of the business was in a bad position. Clark now dealt with the dealers and customers, learned from them about safety problems in Lima cranes of any vintage, and through its dealer and customer network could easily bring news of problems and suggestions for solution to the dealers and customers. Having acquired the service as well as the manufacturing operations of the Lima crane business, Clark—it is no surprise—actually serviced the crane which injured Morrie and about which it is alleged to have known of a hidden and potentially lethal danger, and could easily have warned the owner.

■ This potential liability of Clark's that we are discussing is not bystander liability. It is not a repairman's liability, although that as we have just seen was an element in Morrie's case. And it is not successorship liability. When a buyer of a business is liable as a successor for the torts of the seller, it is automatically liable for all the predecessor's torts. Its liability is not per-

sonal but vicarious, *Liberty Mutual Ins. Co. v. Curtis Noll Corp.*, 112 Mich.App. 182, 315 N.W.2d 890, 893 (1982); *Wilkerson v. C.O. Porter Machinery Co.*, 237 N.J.Super. 282, 567 A.2d 598, 608 (1989), like a principal's liability for the torts of its agents committed within the course of their employment or other agency. Morrie wanted to fasten such liability on Clark but failed. Clark's liability was personal in the sense that Morrie, had his case gone to trial, would have had to prove that Clark had been negligent in failing to warn him or his employer. He would have had to show that Clark not only knew about the defect but knew who owned the crane yet nevertheless failed to take any steps to avert an accident, when a simple warning, easily transmitted to a customer whose name and address were known to Clark, would have been all that was needed. Having inherited his predecessor's dealers and customers, the successor is charged with a limited responsibility for providing warnings to old customers that the predecessor would have been obligated—by products liability law—to provide had it remained in business.

■ The successor's duty to warn is thus designed to plug a gap in products liability law when a firm that would have had a continuing duty to warn the owners of its products leaves the market while those products are still in use. We were told at argument that there are 7,000 Lima construction cranes in service today. Many of them were sold before 1971, and they are the ones most likely to exhibit defects. Had it not been for the sale to Clark, Lima would have retained a duty imposed by products liability law to users of these cranes, such as Morrie. This duty, although not the rest of the duties that tort law imposed on the manufacturer, passed to Clark with the sale of the manufacturing assets to it. The duty is one imposed by products liability law even when it is imposed on a firm that is neither a manufacturer nor a seller of the defective product. Since it is a duty imposed by products liability law, and since the sale of the crane that injured Morrie occurred before the sale of assets to Clark, Dial is obliged to indemnify Clark for the expense of settling with Morrie.

Dial argues that this result will reduce product safety by letting off the liability hook the only entity capable of protecting the users of the old cranes, namely Clark, since Armour got out of the business when the assets of the Construction Equipment Division were sold to Clark in 1971. This is a risk in any indemnification agreement. Suppose Dial had never been in the crane business. Suppose it were an insurance company that had issued a liability insurance policy to Clark. The policy would reduce Clark's incentive to police the safety of Lima cranes, old and new, because within the policy limits the cost of any tort liability for injuries caused by defects in those cranes would be shifted to the insurer.

There are, however, two important differences between the indemnification agreement and the hypothetical insurance policy. The indemnification agreement has no limits; nor is it cancellable. So it shifts the risk of liability more completely to the indemnitor, in this case Dial, than a contract of insurance would. Insurance companies insist on limits, both of time and of amount, in their undertakings to indemnify, fearing that without limits in both the duration of the insurance contract and the amount of damage insured against the insured will lack any incentive to conduct his activities in a prudent manner that will minimize the insurance company's exposure. As long as Dial is solvent, Clark can ignore any safety problems that it discovers in the old cranes, shifting all responsibility for solving those problems to an entity—Dial—that is in no position to shoulder the responsibility, because it is no longer in the business.

Compare a case in which Clark sells a defective part to the owner of a Lima crane manufactured and sold before 1971, and as a result of the defect the operator of the crane is injured. Under the indemnification agreement, the responsibility would be Clark's, not Dial's, because the agreement says that products liability claims shall be deemed to arise from the conduct of the business by the party selling the equipment *or part*. Clark's failure to warn the owner of the old cranes was like the sale of the defective part in our hypothetical example because that failure was tortious conduct committed by Clark itself. Consider finally a case in which Clark, in the course of servicing an old crane, but not replacing any parts, damages the

crane and as a result makes it defective, and again an accident ensues. Analytically this conduct is no different from the sale of the defective part, but if the indemnification provision is read literally the responsibility for the accident would rest on Dial.

The provision reflects a lack of imagination concerning the range of possible products liability claims. But we should not be critical; twenty-three years ago the field of products liability law had not attained its present luxuriant growth. The evident intent of the indemnification provision was, quite sensibly, to make sure that neither the buyer nor the seller was responsible for the conduct of the other. Clark would not be responsible for defects in the old cranes, or Dial for defects in the new ones (that is, ones manufactured or sold after the sale of the business to Clark). The failure to warn about a defect is itself a product defect, and it was a defect introduced in this case by Clark rather than by Dial. Nevertheless the provision is explicit that products liability claims concerning equipment and parts sold prior to the sale of the business are the responsibility of Dial. And Dial has conceded that if Morrie's Count VI is a products liability claim, Dial is liable, not Clark.

Dial might have argued that the indemnification agreement should be reformed to avoid what appears to be an inefficient allocation of responsibilities concerning a form of liability that the parties obviously did not foresee. But it has not made any such argument, and would no doubt have difficulty stuffing this case into the reformation pigeonhole, which requires (so far as possibly pertinent to this case) demonstrating a mutual mistake of fact. *Theophelis v. Lansing General Hospital,* 430 Mich. 473, 424 N.W.2d 478, 487 (1988); *Investors Ins. Co. v. Dorinco Reinsurance Co.,* 917 F.2d 100, 105 (2d Cir. 1990). Dial has not gone that route but instead has staked its all on persuading the district judge and us that Morrie's Count VI was not a products liability claim. We think it was.

AFFIRMED.