Theresa L. Cannon WILLIAMS, on behalf of herself and all others similarly situated, and Lois Reed, Plaintiffs–Appellants,

v.

CHARTWELL FINANCIAL SERVICES, LTD., Defendant–Appellee.

Nos. 99–2258, 99–2287.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 2, 1999.

Decided Feb. 8, 2000.

Tara L. Goodwin (argued), Edelman, Combs & Latturner, Chicago, IL, for Plaintiffs-Appellants.

Paul M. Fullerton (argued), Heroux, Clingen, Callow, Wolfe & McLean, Wheaton, IL, for Defendant-Appellee.

Before COFFEY, FLAUM, and KANNE, Circuit Judges.

FLAUM, Circuit Judge.

The plaintiffs, Theresa L.Cannon Williams and Lois Reed, appeal the district court's grant of summary judgment to defendant Chartwell Financial Services, Ltd. ("Chartwell"). The plaintiffs first argue that the district court erred in determining that Chartwell's practices of demanding cash security for a loan and issuing an alternative payment schedule did not violate the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, as interpreted by the Federal Reserve Board in implementing Regulation Z ("Regulation Z"), 12 C.F.R. § 226. In addition, the plaintiffs challenge the district court's entrance of a protective order limiting the plaintiffs' use of confidential documents and preventing the plaintiffs from contacting Chartwell's customers until class certification was granted. Lastly, Williams appeals the district court's refusal to certify a class in her matter. For the reasons stated below, we reverse the decision of the district court in regard to the cash collateral issue, reverse and remand the district court's decision as to the alternative payment schedule, vacate the protective order entered by the court and remand that issue for further consideration, and remand the district court's decision as to the class certification issue.

## I.  Background

### A.

The defendant, Chartwell Financial Services, is a small consumer lending agency. Chartwell began making loans in March of 1998, and during its short time in operation made just over 100 loans. Two of those loans, one to Theresa L. Cannon Williams and one to Lois Reed, are at the center of the dispute in these cases.

Williams and Reed both entered into loan agreements with Chartwell. Williams signed her loan agreement on May 16, 1998. Under the terms of that agreement, Williams received $750. At the same time Williams received the $750, she was required to give Chartwell $250 in cash as collateral for the loan. Reed entered into her loan agreement with Chartwell on May

26, 1998. Reed's agreement provided for a loan in the amount of $700, with a required security deposit of $200. The security deposits, or cash collateral, were placed in Chartwell's operating account and used by the company for business expenses. f Williams and Reed paid off their loan obligations, the money put up as collateral was to be returned with 9% interest.

When Williams and Reed signed their loan agreements with Chartwell, both were provided with federally-mandated disclosure statements as required by TILA, a federal statute that regulates the content and presentation of such disclosures. Congress enacted TILA to ensure that consumers receive accurate information from creditors in a precise and uniform manner that allows them to compare the cost of credit. 15 U.S.C. § 1601; *Anderson Bros. Ford v. Valencia*, 452 U.S. 205, 220, 101 S.Ct. 2266, 68 L.Ed.2d 783 (1981). Implementing Regulation Z mandates that "[t]he creditor shall make the disclosures required by this subpart clearly and conspicuously in writing, in a form that the consumer may keep. The disclosures shall be grouped together, shall be segregated from everything else, and shall not contain any information not directly related to the [required] disclosures ...." 12 C.F.R. § 226.17(a)(1). The mandatory disclosures, which must be grouped in the federal disclosure section of a written loan agreement, include the finance charge, the annual percentage rate, any security interests taken, and the number and schedule of payments. 12 C.F.R. § 226.18.

The federal disclosure section of the loan agreement signed by Williams listed a finance charge of $900, and an annual percentage interest rate ("APR") of 345.98%. The total amount to be repaid over the course of the loan agreement was $1650. The federally-mandated TILA disclosure section of Williams's loan agreement stated that this amount was to be paid in five monthly installments of $350. In the case of Reed's loan, the finance charge disclosed was $950, and the APR was 427%.

The total amount of Reed's obligation was also $1650, again to be paid in monthly installments of $350.

At the same time Williams and Reed signed their loan agreements with Chartwell containing the required TILA disclosures, they were each provided with an alternative payment schedule. This document outlined a payment schedule by which Williams and Reed would pay off their loans in ten bi-weekly installments, rather than the five monthly installments disclosed in their loan agreements. Because the loans were simple interest loans, and would not be fully amortized if the bi-weekly schedule was adhered to, the alternative payment schedule also provided for an additional interest payment. The additional interest payment amounted to $117 in the case of Williams, and $261 in the case of Reed. Both Williams and Reed were asked to initial this alternative payment schedule.

Neither Williams nor Reed repaid her loan in accordance with either the monthly or bi-weekly schedules provided by Chartwell. Williams made only one payment to Chartwell, totaling $100. Reed has made payments on her loan agreement totaling $550. Chartwell's efforts to collect the outstanding debts owed it by Williams and Reed were suspended when both debtors filed suit in federal district court.

## B.

On October 30, 1998, Williams filed a five-count complaint against Chartwell in federal district court that she styled a "class action." The complaint alleged various violations of TILA, as well as several claims under Illinois law. On the same day that Williams filed her complaint, Reed also filed a one-count complaint against Chartwell. That complaint alleged the same TILA violations as those alleged by Williams. Williams's complaint was eventually reassigned as related to Reed's complaint, and the two cases have been treated as consolidated by both the parties and the district court.

On February 12, 1999, Williams filed a motion for class certification, as well as a memorandum in support of that motion. This motion for class certification was based on the allegations that all of Chartwell's customers were subject to the cash collateral requirement and were provided an alternative payment schedule that differed from the one disclosed pursuant to TILA. Consequently, Williams proposed that classes be certified as to both issues. Chartwell opposed class certification. On March 10, 1999, the district court denied class certification on the ground that Williams had failed to show numerosity. Specifically, the court noted that Williams had not demonstrated that Chartwell required cash collateral and excessive interest from all its customers.

The district court granted Williams's motion to reconsider its decision regarding class certification. Williams then presented additional evidence that the cash collateral requirement and alternative payment schedule were common to all of Chartwell's customers. On March 22, 1999, the district court issued an opinion finding that Williams satisfied all the prerequisites for class certification. Nevertheless, the district court stated that it was not convinced that a class action would be superior to other methods of adjudication. The court then denied Williams's request for class certification, arguing that certification of the classes proposed by Williams would be unmanageable. This finding was based on the district court's doubts about the feasibility of sending out two sets of class notices, as well as its concern over possible confusion as to opt-out rights.

At about the same time the district court denied Williams's motion for class certification, it also entered a protective order requested by Chartwell. The protective order prohibited the plaintiffs from using any documents marked as confidential until class certification was granted for any purpose other than prosecuting the suit. In addition, the protective order prevented the plaintiffs from contacting other members of the putative class. After this protective order was in place, and Chartwell was assured that the plaintiffs would not be able to contact any of its present or former customers, Chartwell turned copies of its loan files over to the plaintiffs.

On May 13, 1999, the district court granted summary judgment to Chartwell with respect to Williams's and Reed's TILA claims, and dismissed their motions for summary judgment as moot. The district court also dismissed the plaintiffs' remaining state law claims without prejudice. Williams and Reed now appeal the district court's grant of summary judgment to Chartwell, alleging various errors in regard to the TILA issues, the entrance of the protective order, and the denial of class certification.

## II. Analysis

We review the district court's grant of summary judgment to Chartwell *de novo*. See *Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 742 (7th Cir.1999). In order to overcome summary judgment, the plaintiffs must show specific facts sufficient to raise a genuine issue for trial. Fed.R. Civ.P. 56(c); *see Shermer v. Illinois Dep't of Transp.*, 171 F.3d 475, 477 (7th Cir.1999) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). In determining whether a genuine issue of material fact exists, we must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. See *Senner v. Northcentral Technical C.*, 113 F.3d 750, 754 (7th Cir.1997). "A genuine issue for trial exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole." *Roger v. Yellow Freight Sys., Inc.*, 21 F.3d 146, 149 (7th Cir.1994).

### A.

#### 1. The Cash Collateral Requirement

The plaintiffs first challenge Chartwell's practice of requiring its customers to pro-

vide cash as collateral for a loan. The plaintiffs argue that the only effect of the cash collateral requirement was to reduce the amounts of the loans. According to the plaintiffs, a $750 loan with a $250 cash security deposit, or a $700 loan with a $200 cash security deposit, is in reality only a $500 loan. Because Chartwell calculated the disclosed APRs according to the stated amounts of the loans, without taking into account the reduction the plaintiffs contend was effected by the cash security, the plaintiffs argue that the APRs disclosed by Chartwell were inaccurate.

■ The plaintiffs argue that in the case of Williams the actual APR, based on a $500 loan, was 619.5%. This interest rate is much higher than the rate disclosed. Similarly, the plaintiffs claim that the actual APR on Reed's loan, calculated according to a $500 loan, was 641%. This too is significantly greater than the rate disclosed. All TILA disclosures must be accurate, and to the extent Chartwell understated the interest rates applicable to the plaintiffs' loans it has violated that statute. *See Gibson v. Bob Watson Chevrolet–Geo, Inc.*, 112 F.3d 283, 285 (7th Cir.1997). Therefore, the first question before this Court is whether the interest rates disclosed by Chartwell were in fact accurate. In order to answer that question, we must determine whether the plaintiffs' characterization of the cash security requirement and its effect on the amounts of the loans is correct.

The district court rejected the plaintiffs' characterization of the loans, and therefore their allegations of TILA violations. Initially, the district court stated that cash should not be treated differently from any other form of security. In support of that proposition the district court correctly noted that if Williams or Reed had put up her car as security for her loan, the value of the car would not have been subtracted from the stated amount of the loan for purposes of the interest rate disclosure. According to the district court, cash is just another form of collateral whose value, like

that of a car, should not be subtracted from the amounts of the loans. Under this reasoning, the actual amounts of the Williams and Reed loans were $750 and $700 respectively, and the disclosed APRs were accurate.

Having found that Chartwell accurately disclosed the relevant APRs if the cash collateral was treated the same as any other form of collateral, the district court then proceeded to consider the effect of a specific TILA provision that treats "deposits" differently from other forms of collateral. The TILA provision governing deposits provides that "[i]f the creditor requires the consumer to maintain a deposit as a condition of the specific transaction [the creditor shall include] a statement that the [APR] does not reflect the effect of the required deposit." 12 C.F.R. § 226.18(r). In effect, TILA requires that the potential impact of a required security deposit on the APR be disclosed. However, the regulations exempt deposits earning interest at a rate of more than 5% per year from this disclosure requirement. 12 C.F.R. § 226.18(r), n. 45. The district court cited this exemption and determined that, even if the cash collateral in these cases was considered a deposit, Chartwell's policy of returning the cash security with 9% interest exempted Chartwell from the disclosure requirements TILA generally places on such deposits.

■ The plaintiffs challenge both the collateral and deposit prongs of the district court's holding as to the cash collateral issue, and we first consider the court's assertion that cash should be treated the same as any other form of collateral. Although the district court focused on a comparison between cash and other forms of security in resolving this issue, we do not believe that this is the correct analytical framework. Such an approach elevates form over substance, and fails to account for this Court's consistent assertion that courts are to focus on the economic substance of the transaction in determining whether TILA has been violated. *See*

*Smith v. Cash Store Management, Inc.*, 195 F.3d 325, 329 (7th Cir.1999); *Adams v. Plaza Finance Co., Inc.*, 168 F.3d 932, 936 (7th Cir.1999). The proper question in these cases is not whether *in form* cash should be treated the same as other kinds of security. Rather, our analysis must look to whether *in substance* the cash security required by Chartwell functioned as a security interest at all. *See Cash Store*, 195 F.3d at 329; *Plaza Finance*, 168 F.3d at 936.

According to Regulation Z, a security interest is "an interest in property that secures performance of a consumer credit obligation and that is recognized by state or federal law." 12 C.F.R. § 226.2(a)(25). Illinois commercial law, in turn, defines a security interest as "an interest in personal property ... which secures payment or performance of an obligation." 810 ILCS 5/1–201(37). As this Court has previously noted, the creation of a security interest gives a creditor an interest in property such that "upon default, [the creditor may] take or sell ... the property—or collateral—to satisfy the obligation for which security interest is given." *Cash Store*, 195 F.3d at 329. In these cases, the cash collateral did not function as a security interest in this way. The cash collateral demanded by Chartwell did not serve to reduce the creditor's risk by providing it with an interest in property it could take or sell upon default. Rather, Chartwell used the cash security as a means to reduce the amounts of money it initially put at risk. Put another way, the real effect of the cash collateral required by Chartwell was not to make the loans more secure, but to reduce the amounts of the loans.

■ Because the cash security demanded by Chartwell served only to reduce the effective amounts of the loans made to the plaintiffs, we proceed with the understanding that those loans were in substance $500 loans. As such, Chartwell was under an obligation to calculate the interest with reference to that amount. Chartwell did not calculate the interest rates according to the $500 loans it made, however, but instead calculated the applicable interest rates according to the amounts of the loans recited in the loan agreements. The result of Chartwell's use of erroneous loan amounts was a significant understatement of the APRs applicable to the plaintiffs' loans. These understatements are inaccuracies for which Chartwell is liable under TILA unless some other provision of TILA exempts it from liability.

■ The only potential exemption from liability applicable to Chartwell is contained in the TILA provisions addressing deposits. Although classification of the cash security as a deposit would generally bring with it disclosure obligations, TILA specifically exempts deposits that earn more than 5% interest. The applicability of this deposit exemption to the facts of these cases is particularly important in light of our determination that Chartwell failed to accurately disclose the APRs applicable to the plaintiffs' loans. Because TILA specifically exempts deposits earning more than 5% interest from its disclosure requirements, a finding that the cash collateral constitutes a deposit, when coupled with the fact that the deposits in these cases were to be returned with 9% interest, would effectively provide Chartwell with a safe harbor from TILA liability. As such, we must look at the economic substance of the transaction to see if the classification of the cash collateral as a deposit provides a basis for relieving Chartwell from liability under the statute. *See Cash Store*, 195 F.3d at 329; *Plaza Finance*, 168 F.3d at 936.

After a review of the relevant statutory provisions governing deposits, we cannot conclude that the cash collateral required by Chartwell was the kind of deposit contemplated by 12 C.F.R. § 226.18(r) of TILA. While this provision refers only to "deposits," the Official Staff Commentary to 12 C.F.R. § 226.18(r) interprets the deposit exemption with reference to "[i]nterest-bearing accounts." Official Staff Commentary to Regulation Z, § 226.18(r). We

read this comment to mean that the drafters did not intend the deposit provisions to apply to any kind of deposit, but only to traditional forms of deposit accounts. It is our further understanding that these traditional kinds of accounts, as represented by the words "interest-bearing accounts," or "deposits," are deposit accounts held with federally-regulated institutions. This understanding is initially based on the fact that the acceptance and maintenance of deposit accounts is a core function of the banking industry. *See* 5A *Michie on Banks and Banking* Ch.9, § 3 ("A deposit is a transaction peculiar to the banking business."). As such, a natural reading of the word "deposits" or "interest-bearing accounts" would seem to refer to deposits made within that industry. *See id.* ("The term 'deposit' signifies the act of placing money in the 'custody' of a bank, to be withdrawn at the will of the depositor.").

More significantly, the definitions given to "deposit" in other provisions of TILA support the conclusion that the deposit exemption applies only to deposits held at federally-regulated institutions. Although other provisions of TILA assign multiple meanings to the word "deposit," all of those definitions involve placing money with a "depository institution" or its affiliate. 12 C.F.R. § 204.2(a)(1). A "depository institution" is then defined quite broadly, but all of the institutions considered as such are federally-insured and federally-regulated entities or are eligible to become such. 12 C.F.R. § 204.2(m)(1). Thus, TILA itself indicates that deposits are accounts accepted and maintained by federally-regulated banks and other savings institutions. Given that Chartwell is not licensed to accept deposit accounts, and the cash security it accepts is not federally insured or federally regulated, Chartwell does not qualify for the deposit exemption contained in 12 C.F.R. § 226.18(r), note 45 simply by virtue of collecting the cash collateral from its customers.

Chartwell further argues, however, that even if the deposit contemplated by 12 C.F.R. § 226.18(r) of TILA must be with a federally-regulated institution, the cash collateral it requires nonetheless qualifies for this exemption by virtue of the fact that the money was placed in its general operating account. According to Chartwell, its general operating account is the kind of interest-bearing account referred to in the regulation. Under this interpretation, the cash security was placed in an interest-bearing account returning more than 9% interest, and Chartwell is exempt from the disclosure requirements applicable to deposit accounts. We find this argument meritless in light of the fact that Chartwell did nothing to segregate the funds given to it as security, nor can it point to any interest-bearing accounts earning 9% interest established in the name of its customers. *See Therrien v. Resource Financial Group, Inc.*, 704 F.Supp. 322 (D.N.H.1989) (holding that a creditor did qualify for the deposit exemption where the security deposit was placed in a separate account and the borrower retained apparent title to, and benefit of, the funds). Chartwell's inability to point to any such accounts is notable because of what it says about the substance of the transactions at issue. *See Cash Store,* 195 F.3d at 329; *Plaza Finance*, 168 F.3d at 936. In demanding cash collateral from its customers Chartwell did not take security interests in deposit accounts, but rather lowered its risk by reducing the effective amounts of the original loans. *See Cash Store*, 195 F.3d at 329; *Plaza Finance*, 168 F.3d at 936.

Because an examination of the economic substance of the transactions reveals that the cash collateral required by Chartwell does not constitute a deposit account, and because the cash collateral did not function as a security interest, Chartwell's failure to disclose the impact of that collateral on the APRs constitutes a violation of TILA. In making this conclusion, we again emphasize the importance of substance over form in TILA litigation. *See Cash Store*, 195 F.3d at 329; *Plaza Finance*, 168 F.3d

at 936. The purpose of the cash collateral in these cases was not to create additional security for the loans, but rather to reduce the amounts of the loans themselves. Having thus effectively reduced the amounts of the loans given to the plaintiffs, Chartwell was under an obligation to disclose the APRs as calculated according to the effective amounts of the loans. Chartwell did not calculate the interest rates applicable to the plaintiffs' loans based on the effective amounts of the loans, however, and that failure resulted in inaccurate disclosures in violation of TILA. Accordingly, we reverse the decision of the district court as to the cash collateral issue.

## 2. The Alternative Payment Schedule

The plaintiffs next contend that Chartwell's practice of issuing an alternative payment schedule constitutes a violation of TILA. According to Williams and Reed, they, along with the rest of Chartwell's customers, were forced to initial an alternative bi-weekly schedule at the time they initially signed their loan agreements. The plaintiffs allege that this alternative payment schedule conflicted with the number and schedule for payments Chartwell provided in the federally-mandated TILA disclosures and that the issuance of conflicting payment schedules is a violation of TILA. The question before this Court, then, is whether the alternative bi-weekly payment schedule provided by Chartwell actually conflicted with the one disclosed pursuant to TILA.

The district court granted summary judgment to Chartwell on the issues surrounding the alternative payment schedule. The district court based its ruling on two grounds. First, the district court stated that there was no evidence that the alternative payment schedule at issue was mandatory. According to the court, as long as Chartwell did not require its customers to adhere to the alternative payment schedule, then that schedule did not conflict with the mandated schedule disclosed in the federal disclosures box. Sec-

ond, the district court determined that even if the alternative schedule was mandatory, it would still not constitute a violation of TILA because payment according to the alternative bi-weekly schedule would result in a lower interest rate being paid by the consumer. In effect, a mandatory bi-weekly schedule would result in an overstatement of the applicable APRs. According to the district court, a mere overstatement of the interest rate, absent other circumstances requiring the creditor to be held liable, does not constitute a violation of TILA.

The district court was correct insofar as its decision indicates that an overstatement of the applicable interest rate alone cannot serve as a basis for TILA liability. TILA specifically provides that "[t]he disclosure of an amount or percentage which is greater than the amount or percentage required to be disclosed ... does not in itself constitute a violation of [TILA]." 15 U.S.C. § 1602(z). However, TILA also states that a disclosed APR is considered accurate only "if it is not more than ⅛ of one percentage point above or below the [actual APR]." 12 C.F.R. § 226.22(a)(2). This provision indicates that in some circumstances, overdisclosure of the APR can constitute a violation of TILA. Recognizing the apparent tension between these two provisions of TILA, we must consider what conditions must be present such that an overstatement of the APR violates TILA. The district court did not reach this issue because of its belief that the plaintiffs based their complaints solely on an overstatement of the applicable interest rates, and because of the perceived failure of the plaintiffs to plead the something extra required by TILA. It is necessary for us to address this question, however, in order to determine whether summary judgment was appropriately granted as to the alternative payment schedule.

█ In trying to determine what it is the plaintiffs must show in addition to overdisclosure, we first look to the Federal Reserve Board's interpretation of the stat-

ute. *See Ford Motor Credit Co. v. Milhollin,* 444 U.S.555, 557, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980) (stating that courts should give "a high degree of deference" to the Federal Reserve Board's interpretation of TILA). In this regard, we find note 45d to 12 C.F.R. § 226.22 illuminating. That note states that:

> An error in disclosure of the annual percentage rate or finance charge shall not, in itself, be considered a violation of this regulation if: (1) The error resulted from a corresponding error in a calculation tool used in good faith by the creditor; and (2) upon discovery of the error, the creditor promptly discontinues use of that calculation tool for disclosure purposes and notifies the Board in writing of the error in the calculation tool.

12 C.F.R. § 226.22 n. 45d. It is our understanding that this note clearly illustrates the circumstances in which overdisclosure of the applicable interest rate is not a violation of TILA. *See In re Cox,* 114 B.R. 165, 168 (Bankr.C.D. Ill.1990). Except in circumstances where the error arises from the good faith use of a calculation tool, and where that error is promptly remedied upon discovery, an overdisclosure of more than ⅛ of one percent constitutes a violation of TILA. *See id.*

This resolution effectuates the possibility of liability for overstatements provided in 12 C.F.R. § 226.22(a), while at the same time recognizing that creditors may at times be exempt from liability for overstatements as provided for in 15 U.S.C. § 1602(z). Moreover, liability for overdisclosures is consistent with TILA's goal of allowing consumers to accurately compare credit rates. 15 U.S.C. § 1601(a); *see Brown v. Marquette S. & L. Ass'n,* 686 F.2d 608, 612 (7th Cir.1982) (stating that the fundamental purpose of TILA is to provide information to facilitate comparative credit shopping and thereby the informed use of credit by consumers). Where a rate is overdisclosed, a consumer may pass up what is in reality a more favorable interest rate for a less favorable

one. When this happens consumers are harmed, perhaps without even knowing it, by the creditor's failure to accurately disclose the interest rate. *See Gibson,* 112 F.3d at 285 (stating that the purpose of TILA "is to protect consumers from being misled about the cost of credit"). Thus, in order to effectuate the congressional desire to allow consumers to compare the cost of credit, we hold that an overdisclosure of the applicable interest rate is a violation of TILA absent a showing that the error in question falls within the exemption provided in 12 C.F.R. § 226.22, note 45d.

■ The district court granted summary judgment to Chartwell based on its finding that the plaintiffs alleged only that Chartwell had overstated the interest rates applicable to their loans. Yet given our holding that such overstatements are a violation of TILA absent a showing of inadvertence, the plaintiffs' allegations as construed by the district court were more than sufficient to overcome Chartwell's motion for summary judgment. The plaintiffs alleged that Chartwell overstated the interest rates applicable to their loans, and there is no indication that this overstatement was the result of an erroneous calculation tool. More significantly, because Chartwell knew they were providing conflicting schedules, and because payment according to the bi-weekly rate results in an overstatement of the annual percentage interest rates, Chartwell has no basis for arguing that the inaccurate disclosures in these cases were inadvertent. *See* 15 U.S.C. § 1640(c) (stating that the "bona fide error" defense does not apply to "an error of legal judgment with respect to a person's obligations under this subchapter").

By this analysis, we do not mean to indicate that Chartwell has necessarily violated TILA by the very act of providing an alternative payment schedule. As we stated previously, the determination as to whether the alternative payment schedule issued by Chartwell violates TILA centers

on whether the alternative payment schedule conflicts with the schedule provided in the TILA disclosures. While TILA requires that the number and schedule of payments be accurately disclosed, it presumably does not prevent consumers from repaying the loan more quickly if that is more convenient. Nor does TILA prevent creditors from accepting payments more frequently than the consumer is required to pay according to the number and schedule of payments disclosed pursuant to TILA. In light of our understanding that TILA requires accurate disclosure of the number and schedule of payments, but does not preclude consumers from deviating from that schedule in all circumstances, we believe that the issue of whether the alternative payment schedule conflicts with the schedule disclosed pursuant to TILA turns on the issue of voluntariness.

▪ To the extent the bi-weekly schedule was wholly voluntary, and Chartwell's customers understood that fact, the alternative schedule would not violate TILA. While the district court resolved the issue of voluntariness against the plaintiffs on summary judgment, we do not believe this was the proper disposition. The plaintiffs testified that the alternative schedule was presented to them as mandatory, and there is no indication that the district court found this testimony to lack credibility. Furthermore, the plaintiffs contend that Chartwell required its customers to initial the alternative schedule, a practice that lends support to the plaintiffs' contention that they were bound to that schedule. Chartwell's practice of requiring its customers to initial the alternative payment schedule, when coupled with the plaintiffs' testimony that the schedule was presented to them as mandatory, presented issues of material fact as to the voluntary nature of the alternative payment schedule and the plaintiffs' understanding as to whether they were bound by that schedule that should properly have been resolved at trial.

In finding that the alternative schedule was not mandatory, the district court placed a great deal of weight on the fact that it resulted in less favorable terms for Chartwell. However, it is not clear to us that this gives rise to a strong presumption that Chartwell did not intend for its customers to abide by the bi-weekly schedule. Payment at a faster schedule may well be advantageous to a company like Chartwell. Adherence to the bi-weekly schedule increases the speed of repayment, a factor which is particularly important to a small company like Chartwell with few cash reserves. In addition, repayment according to a bi-weekly schedule may decrease the possibility of default. While this is not to say that the alternative payment schedule was mandatory, it does indicate that the district court was too quick to rely on the perceived disadvantage of the alternative schedule to Chartwell. The plaintiffs presented evidence that gave rise to a material issue of disputed fact, and their claim that the alternative payment schedule violated TILA should not have been dismissed on summary judgment. Accordingly, we remand this issue for further proceedings in the district court consistent with this opinion.

## B.

▪ We now turn to the procedural issues. The plaintiffs challenge both the district court's entrance of a protective order on behalf of Chartwell, and the court's refusal to grant class certification in the Williams matter. In considering these issues on appeal, we review the district court's decision to deny class certification on Williams's complaint, as well as the court's entrance of a protective order on behalf of Chartwell, for an abuse of discretion. *See Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100–01, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981) (protective orders); *Keele v. Wexler*, 149 F.3d 589, 592 (7th Cir.1998) (class certification).

*1. The Protective Order*

▮ The plaintiffs challenge the district court's entrance of a protective order on behalf of Chartwell. That order prevented documents marked as confidential from being used for any purpose other than prosecuting or defending this action, and made any other use of these documents contingent on class certification being granted. The order also prohibited the plaintiffs from contacting members of the putative class of Chartwell's customers. The plaintiffs claim that this order unconstitutionally deprived them of relevant documents, put them at a great disadvantage in responding to Chartwell's summary judgment motion, and deprived them of useful information to support Williams's motion for class certification.

▮ The decision to grant a protective order is a discretionary one to be used by courts to control the course of class action litigation. The discretion to issue such orders has been vested with trial courts because it is well-recognized that class actions present

> opportunities for abuse as well as problems for courts and counsel in the management of cases. Because of the potential for abuse, a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties.

*Gulf Oil*, 452 U.S. at 100, 101 S.Ct. 2193. In these cases, the district court was clearly concerned about the potential for abuse if the plaintiffs were allowed to contact Chartwell's customers, and expressed concern over the effect of such contacts on Chartwell's business. This is a legitimate concern, and certainly presents a potential justification for the district court's limitations on discovery.

▮ Nevertheless, a district court's discretion in this area is not unlimited. *See id.* The plaintiffs have a right to contact members of the putative class, *see id.*; *EEOC v. Mitsubishi Motor Mfg. of America, Inc.*, 102 F.3d 869, 870 (7th Cir. 1996), and any discovery limitations should be carefully drawn, *see Gulf Oil*, 452 U.S. at 104, 101 S.Ct. 2193. The district court's decision as to the protective order must involve a careful balancing of the potential for abuse created by the class action and the right of the plaintiffs to contact potential class members. *See id.* Because this balancing is involved, and because this area involves important competing concerns, "an order limiting discovery communications between parties and potential class members should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." *Id.* at 101, 101 S.Ct. 2193.

After examining the district court's decision to grant a protective order against the backdrop of the competing concerns at work in this area, it is apparent that the district court did not develop a sufficient appellate record for us to determine whether the interests of both parties were adequately considered. The Supreme Court was clear in stating that when a protective order such as the one in these cases is entered, that order should be based on a clear record and specific findings. *See id.* Other than the district court's concern over the impact the plaintiffs' contact with putative class members would have on Chartwell's business, it is not clear from the record what factors the district court considered. This is not to say that the district court was wrong. As we have stated, given the potential for abuse in class actions a protective order is permissible under certain circumstances. However, we cannot determine from the record below and from the district court's findings whether those circumstances were present in these cases. We therefore vacate the protective order entered by the district court and remand this issue for further proceedings consistent with this opinion.

## 2. Class Certification

Williams also challenges the district court's denial of class certification. In order to show that class certification is justified, Williams must satisfy the four requirements of Rule 23(a) of the Federal Rules of Civil Procedure. These requirements include: (1) that the class is so numerous that joinder of all members is impracticable; (2) that there are questions of law or fact common to the class; (3) that the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) that the representative parties will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a). In addition, the district court must determine that Williams meets one of the requirements of Rule 23(b) of the Federal Rules of Civil Procedure. As applied to this type of case, that rule requires that common questions of law and fact predominate over questions involving individual members, and that a class action is superior to other forms of adjudication. Fed.R.Civ.P. 23(b)(3).

In denying Williams's motion for class certification, the district court found that she satisfied all the requirements of Rule 23(a). Specifically, the court held that Williams had successfully demonstrated numerosity, commonality, typicality, and representativeness. However, the district court went on to deny class certification on the grounds that the class would be unmanageable, and that it was not convinced that a class action would be superior to other forms of adjudication. The district court noted that the class certification proposal separated the potential plaintiffs into two different classes, which would multiply and burden the expense of class management. The district court was further concerned about confusion on the part of potential class members, particularly as to their opt-out rights.

In considering the class certification issue under Rule 23(b), the district court properly considered the issue of whether a class action would be superior to other forms of adjudication. Fed.R.Civ.P. 23(b). A central question for the district court in this regard was that of manageability. Fed.R.Civ.P. 23(b)(3)(D); *see Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) (noting that manageability "encompasses the whole range of practical problems that may render the class action format in appropriate fora particular suit"). While appropriately considering the manageability issue, however, it appears as if the district court may have placed too much weight on the issue of subclasses. Rule 23 specifically provides for multiple classes in a single case, Fed.R.Civ.P. 23(c)(4)(B), and classes have been certified in cases where multiple classes were required. *See, e.g., Keele v. Wexler*, 149 F.3d 589 (7th Cir.1998). The fact that Rule 23 provides for subclasses when they are efficient makes it clear that the existence of multiple classes, in and of itself, is not sufficient to justify the district court's denial of class certification.

In stating that the district court may have placed too much emphasis on the issue of subclasses, we do not mean to imply that the district court erred in refusing to grant Williams's request for class certification. The district court did express specific concerns as to the manageability of multiple classes that may justify denying Williams's request for class certification. However, it is not clear from the record whether the district court based its denial of class certification on general issues of manageability, or whether the district court erroneously believed that the very existence of subclasses justified the denial. Our concern in this regard is heightened by the importance of the class certification issue in TILA cases, where the small amounts of money involved and the difficult financial situations of many of the litigants may inhibit individualized litigation. *See Crawford v. Equifax Payment Serv., Inc.*, 201 F.3d 877 (7th Cir.2000); *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir.1997); *Haynes v. Logan Furniture Mart, Inc.*, 503 F.2d 1161, 1164–

65 (7th Cir.1974). Accordingly, we remand the class certification issue to the district court for further proceedings consistent with this opinion.

### III. Conclusion

In regard to the TILA issues in these cases, we REVERSE the decision of the district court as to the cash collateral issue, and REVERSE and REMAND the court's decision regarding the alternative payment schedule for further proceedings consistent with this opinion. We also VACATE the protective order entered by the district court and REMAND the issue to the district court for further proceedings consistent with this opinion. Lastly, we REMAND the decision of the district court denying Williams's motion for class certification.