**PUBLISH**

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE ELEVENTH CIRCUIT**

No. 97-2104

D.C. Docket No. CV-94-30401-RV

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
09/11/98
THOMAS  K. KAHN
CLERK

WILLIAM O. WATKINS,
WILLIAM R. MALLORY,

Plaintiffs-Appellants,

versus

SVERDRUP TECHNOLOGY, INC.,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Florida

**(September 11, 1998)**

Before HATCHETT, Chief Judge, GODBOLD and RONEY, Senior Circuit Judges.

HATCHETT, Chief Judge:

Appellants William Watkins and William Mallory challenge the district court's entry of judgment as a matter of law on their claims of discriminatory discharge in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 623(a)(1) (1994). Finding no substantial conflict in the evidence that appellee Sverdrup Technology, Inc., terminated Watkins and Mallory under a bona fide – albeit unconventional – reduction-in-force plan that age did not motivate, we affirm.

## I. FACTS[1]

Sverdrup is a support services independent contractor of the federal government. It provides high technological engineering services in support of research, development, acquisition and testing of conventional weapons systems to the United States Air Force at Eglin Air Force Base, Florida. Under a "cost plus fixed award fee" contract, Sverdrup's Technical and Engineering Acquisition Support Group (TEAS) performs these discrete (and often classified) engineering tasks at the Air Force's direction and discretion. The amount and variety of work that TEAS performs ebbs and flows with the Air Force's needs.[2] The Air Force reimburses Sverdrup for TEAS's direct costs, including employees' salaries, retirement benefits and overhead. The contract caps Sverdrup's profit, and the amount it actually receives corresponds to the percentage "grade" that the Air Force assigns TEAS twice a year. In grading TEAS, the Air Force evaluates, among other factors, its work product and management of employees' unproductive overhead time, labeled "G-65."

---

[1] Unless otherwise indicated, we derive the facts from the undisputed (or insubstantially conflicting) evidence before the jury.

[2] For stability purposes, however, the Air Force attempts to assign a significant number of long-term tasks to Sverdrup.

2

TEAS consists of eight departments. In 1988, Sverdrup hired Watkins, then age 54, and Mallory, then age 57, as "Associate Principal Engineers" for TEAS's Guidance and Control Department, known as "T-60."[3] "Associate Principal Engineer" reflects a pay grade, not the skills for which the employee is hired.[4] Sverdrup considered Watkins and Mallory to be seeker/sensor engineers, that is, critically skilled in laser radar, infra-red, visible optics or other wavelength technology used to find and identify weapons' targets. Specifically, it viewed Watkins's primary skill to be laser radar and secondary skill to be infra-red; it viewed Mallory's primary skill to be infra-red and secondary skill to be laser radar. The vast majority of tasks that T-60's director (and others) assigned to Watkins and Mallory involved application of these critical skills. In fact, Watkins served as a task leader for the Advanced Technology Laser Seeker System Project, or "ATLAS."[5]

Beginning in late 1991, the management of TEAS – Duane Bowyers, General Manager, and Ralph Calhoun, Deputy General Manager – learned that the Air Force's demand for seeker/sensor services would decrease in 1992. This decline stemmed in part from what the government and TEAS learned from the Persian Gulf War: infra-red and laser radar guided weapons do not function very well in smoke and at night. Thus, the Air Force changed its focus to inertial and satellite guided weapons, systems that did not involve infra-red or laser radar

---

[3] Bud George, then-Director of T-60, hired Watkins. Ralph Calhoun, then-Hiring Director of TEAS, recruited Mallory. Both Watkins and Mallory became at-will employees.

[4] At trial, witnesses analogized "Associate Principal Engineer" to the federal government's general schedule (GS) pay scale.

[5] While at TEAS, Watkins worked on only one project that did not involve seeker/sensor technology.

3

technology.[6]  Additionally, in the summer of 1992, the Air Force canceled the ATLAS project

due to its dissatisfaction, further reducing TEAS's projected seeker/sensor work.

Based on these developments, TEAS found itself with a surplus of seeker/sensor

engineers and a shortage of engineers skilled in these newly emerging technologies.  In May

1992, TEAS's management, including its department directors, began exploring methods of

reducing the number of seeker/sensor engineers on staff.[7]  Ultimately, Bowyers decided that

TEAS had to abolish some jobs under a reduction-in-force (RIF) plan.[8]  To determine who to

include in the RIF, Bowyers asked the directors to submit the names of engineers in their

department who had accumulated excessive "G-65" time.  Robin Reid, Director of T-60,

recommended three engineers for inclusion in the RIF:  (1) Ed Friday, then-age 43; (2) Watkins,

then-age 58; and (3) Mallory, then-age 61.[9]

In follow-up discussions, Bowyers, Calhoun and the eight department directors discussed

Sverdrup's RIF policy.  As to each engineer recommended for discharge, management

considered his or her:  (1) affected job; (2) qualifications for any open position; (3) performance

---

[6]  Witnesses referred to this new weapons development as global positioning systems (GPS).

[7]  To this aim, Sverdrup terminated some employees for cause, that is, poor performance.

[8]  TEAS's policy defined an RIF as "the termination of employees for reasons beyond their control such as a lack of work because of reorganization, elimination or consolidation of jobs or job functions, partial or complete contract termination, or reduced level of contract effort."

[9]  Within Reid's department, Friday ranked first in "G-65" time; Watkins, ninth; and Mallory, third.

4

evaluations; (4) personal problems; and (5) length of service.[10] As the final decision-makers, Bowyers and Calhoun accepted in part, and rejected in part, the directors' recommendations. Unfortunately for them, Watkins and Mallory made the cut. According to management, no long-term seeker/sensor work existed for Watkins or Mallory; they were not well-qualified for any available position within TEAS; Reid lacked confidence in Watkins's performance due to the failure of ATLAS; and Watkins and Mallory had been employed for only four years.[11]

In November 1992, Sverdrup implemented the RIF. It discharged eight TEAS Associate Principal Engineers: Watkins, Mallory, Friday, and five engineers who worked in departments other than T-60. Collectively, their ages ranged from 43 to 67. Within the same month, Sverdrup hired ten new employees for TEAS, four of whom it assigned to T-60, and two of those four were Associate Principal Engineers. Other than one 55-year-old engineer, the new hires were all under 40 years of age, ranging from 24 to 35. None of these new hires, however, served as a seeker/sensor engineer. Rather, they were critically skilled in aircraft integration, systems integration and product manufacturing. Sverdrup did not hire a new seeker/sensor until September 1993, and he performed tasks involving optical train design. Despite the RIF, TEAS

---

[10] None of the engineers discharged under the RIF had worked for Sverdrup for more than 6 years.

[11] Although witnesses testified that management also considered Watkins and Mallory to be poor performers in general, the evidence (namely their favorable performance evaluations prior to Reid's promotion to Director of T-60 in April 1992) presented a substantial conflict on that point. Undisputed evidence, however, supported the finding that after Watkins's last favorable performance evaluation, the failure of ATLAS caused Reid to lose confidence in him.

experienced no net decrease in its workforce throughout November 1992.[12]  In fact, TEAS's

workforce increased fifteen percent that year.[13]

## II.  PROCEDURAL BACKGROUND

Watkins and Mallory initiated this lawsuit in the United States District Court for the

Northern District of Florida, alleging that Sverdrup discharged them in November 1992 because

of their ages, in violation of the ADEA, 29 U.S.C. § 623(a)(1).  The parties tried the case before

a jury.  When Watkins and Mallory rested their case-in-chief, Sverdrup moved for, but the court

denied, judgment as a matter of law under Federal Rule of Civil Procedure 50(a).[14]  At the close

of all the evidence, Sverdrup again moved for judgment as a matter of law under rule 50(a).  The

court reserved ruling and submitted the case to the jury.  After deliberating for six hours, the

foreperson reported that the jury could not agree on a verdict.  Initially, the court declared a

mistrial.

Two months later, however, the district court issued an order granting Sverdrup's motion

for judgment as a matter of law.  The court first rejected Watkins and Mallory's reliance on "raw

---

[12]  TEAS's workforce remained steady in November 1992; both on November 1 and
November 30, its workforce totaled 313.

[13]  On January 1, 1992, TEAS's workforce totaled 278; on December 31, 1992, it totaled
320.

[14]  In denying the motion, however, the district court remarked that Sverdrup's motion
presented "a relatively close question, and when [Sverdrup] put[s] on [its] evidence it may result
in a different decision."

The district court did grant Sverdrup's motion with regard to Mallory's claim that in
revoking his post-termination access to job placement facilities and equipment, Sverdrup
retaliated against him for filing an EEOC complaint.  (The district court subsequently denied
Mallory's motion to reconsider that ruling.)  Mallory appeals this judgment.  Pursuant to
Eleventh Circuit Rule 36-1, we affirm without discussion.

. . . data" because they failed to demonstrate its statistical significance. Next, the court viewed the evidence as "overwhelming" and one-sided that "the RIF was a legitimate response to the expressed desires and reduced needs of the Air Force, and not a pretext for intentional age discrimination." Finally, the court concluded that no reasonable jury could find that Sverdrup included Watkins and Mallory in the RIF on the basis of their ages because no more than a scintilla of evidence showed that they were similarly situated to younger engineers hired during the month of the RIF.

### III. ISSUE

The only issue we address is whether the district court erred in granting Sverdrup's motion for judgment as a matter of law at the close of all the evidence presented at trial on Watkins's and Mallory's discriminatory discharge claims arising under the ADEA. The standard of review is <u>de novo</u>, and "we employ the same standard as the district court used in determining whether to grant the motion." <u>Walker v. Nationsbank, N.A.</u>, 53 F.3d 1548, 1555 (11th Cir. 1995). Like the district court, we must view "all the evidence in the light most favorable to the nonmoving [parties]," Watkins and Mallory. <u>Broaddus v. Florida Power Corp.</u>, No. 96-3262, slip op. at 3348 (11th Cir. July 10, 1998). The district court correctly granted Sverdrup's motion if no reasonable jury could find in favor of Watkins and Mallory. <u>See</u> Fed. R. Civ. P. 50(a)(1). The district court should have denied Sverdrup's motion only if Watkins and Mallory "provide[d] more than a mere scintilla of evidence" so as to create a "substantial conflict in evidence to support a jury question" on all the essential elements of their claim. <u>Tidwell v. Carter Products</u>, 135 F.3d 1422, 1425 (11th Cir. 1998) (quoting in part <u>Carter v. City of Miami</u>, 870 F.2d 578, 581 (11th Cir. 1989)) (internal quotation marks omitted).

7

## IV. DISCUSSION

Under the ADEA, it is unlawful for an employer "to discharge any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1) (1994). Where, as here, the employer produces evidence that it discharged the plaintiff during a RIF, "the plaintiff establishes a <u>prima facie</u> case by demonstrating (1) that he was in a protected age group and was adversely affected by an employment decision, (2) that he was qualified for his current position or to assume another position at the time of discharge, and (3) evidence by which a fact finder reasonably could conclude that the employer intended to discriminate on the basis of age in reaching that decision." <u>Williams v. Vitro Services Corp.</u>, No. 97-2518, slip op. at 3248 (11th Cir. July 1, 1998) (footnote omitted); <u>see also</u> <u>McCorstin v. United States Steel Corp.</u>, 621 F.2d 749, 752-54 (5th Cir. 1980) (if a case involves an RIF, the court should not apply mechanistically the traditional <u>prima facie</u> age discrimination test, namely the element that employer "replaced" plaintiff with an individual under forty years of age) (Kravitch, J.). The burden of production then shifts to the employer, who must articulate at least one legitimate, non-discriminatory reason for discharging plaintiff. <u>E.g.</u>, <u>Tidwell</u>, 135 F.3d at 1426 (employer successfully "proffered its RIF as a legitimate, nondiscriminatory reason for terminating [plaintiff], eliminating the presumption of discrimination that attached to [plaintiff's] prima facie case"). Of course, the employer's "burden is production not persuasion. . . . The ultimate burden of persuasion remains at all times with plaintiff." <u>Eastland v. Tennessee Valley Auth.</u>, 704 F.2d 613, 619 (11th Cir.), <u>modified in part on reh'g on other grounds</u>, 714 F.2d 1066 (11th Cir.), <u>cert. denied</u>, 465 U.S. 1066 (1983). To this aim, plaintiff's ensuing "burden of proving [that the employer's proffered explanation is pretextual] merges with the plaintiff's ultimate burden of

8

proving that age was a determining factor in his discharge, and it can be met by showing that a discriminatory reason more likely than not motivated the employer's decision, or by discrediting the employer's proffered explanation." Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1228 (11th Cir. 1993). Under the latter approach, plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find [all of those reasons] unworthy of credence." Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997) (internal quotation marks and citation omitted), cert. denied, 118 S. Ct. 685 (1998).

Because of the procedural posture of this case, we assume, without deciding, that Watkins and Mallory presented prima facie cases of age discrimination. See Tidwell, 135 F.3d at 1426 n.1 (in reviewing district court's decision on employer's motion for judgment as a matter of law at the close of all the evidence, appellate court's task "is not to revisit whether the plaintiff below successfully established a prima facie case of discrimination[]"). Likewise, no dispute exists that Sverdrup met its burden of production, that is, it proffered the RIF – including the reasons behind its implementation and plaintiffs' inclusion in it – as a facially legitimate, non-discriminatory reason for discharging plaintiffs. Presently, then, we focus on whether Watkins and Mallory presented sufficient evidence for a reasonable jury to find that the RIF was a pretext for intentional age discrimination.

Our review of the record reveals no such jury question. First, the data concerning employment activity at TEAS in November 1992 – the only real affirmative evidence of age discrimination that Watkins and Mallory presented in their case-in-chief – lacked sufficient depth, specificity and probative value to constitute both prima facie and pretext evidence. See

9

Grigsby v. Reynolds Metals Co., 821 F.2d 590, 596 (11th Cir. 1987) ("[A] plaintiff may not . . . merely rest on the laurels of her prima facie case in the face of powerful justification evidence offered by the defendant."); accord Maddow v. Procter & Gamble Co., 107 F.3d 846, 852 (11th Cir. 1997) ("Evidence offered in the prima facie case may be sufficient to raise a genuine issue of material fact regarding pretext.") (emphasis added). To be sure, Watkins and Mallory did not attempt to establish prima facie cases of age discrimination through statistics. See Earley v. Champion Int'l Corp., 907 F.2d 1077, 1079-81 (11th Cir. 1990) (plaintiff may establish a prima facie case of age discrimination "by demonstrating through statistics a pattern of discrimination"; although "ninety-eight employees at [the paper mill facility where plaintiffs worked] lost jobs as a result of [a] reduction in force[,]" and "many" employees were older and younger than plaintiffs, "[i]nsufficient data [existed] to prove a pattern of discrimination"); see also Maddow, 107 F.3d at 850, 852 (plaintiff raised jury question of pretext through expert's statistical analysis that disparity in ages of employees hired had "less than a one in one thousand chance of having randomly occurred" even though it did not account for applicants' individual recruiting scores because employer "failed to rebut" this circumstantial, and plaintiff's direct, evidence of discrimination). Among other shortcomings, they failed to establish any statistical significance to the data. See, e.g., Benson v. Tocco, Inc., 113 F.3d 1203, 1209-10 (11th Cir. 1997) (plaintiff-Archambault raised jury question of pretext in part through expert's "statistically significant" conclusion that employer

terminated workers over 40 years-of-age at 5, and workers over 50 years-of-age at 3, times the rate that it terminated younger workers during the RIF); see also, e.g., Eastland, 704 F.2d at 625 (regression analysis insufficient to establish prima facie case of racial discrimination in promotions because of "the weakness of the theoretical foundation and the failure to control for job category").[15]

At best, the data that plaintiffs presented to the jury painted an incomplete picture. Watkins, a lay witness, testified that Sverdrup terminated 8 TEAS "Associate Principal Engineers" – all over 40 years-of-age, the average being 56.6 – in the same month that it hired 10 new TEAS engineers – just one over 40 years of age, 55, the average being 33.7. He additionally observed that the average age of the 3 T-60 engineers that Sverdrup discharged was 54.4, while the average age of T-60's 4 new hires was 30.9. Noticeably absent from Watkins's mathematical observations, however, was the fact that TEAS retained scores of employees well over forty years-of-age after the RIF. Indeed, no witness calculated the average age of TEAS's (and/or T-60's) workforce before and after the RIF.[16] Compare with Tidwell, 135 F.3d at 1427 (employer's "expert showed that the

_____

[15] Of course, even statistically significant evidence can fail to create a jury question of pretext. See Benson, 113 F.3d at 1209-10 (plaintiff-Dollar failed to raise jury question that employer's proffered explanation that Dollar refused to learn a new computer program was a pretext for age discrimination because Dollar conceded that he expressed such disinterest, even though Dollar presented "statistically significant" evidence that employer terminated workers over 40 years-of-age at 5, and workers over 50 years-of-age at 3, times the rate that it terminated younger workers during the RIF).

[16] Although plaintiffs introduced into evidence a computerized printout of TEAS's age-ranked November 1992 employees, which included the RIF'ed engineers, courts do not expect juries to use calculators or find a mathematician among its members. Furthermore, such

11

average age of the sales force actually increased slightly after the RIF"). The most fatal shortcoming, though, was that other than identifying the "Associate Principal Engineer" status of two new hires – a title that merely reflected those engineers' pay grade – plaintiffs did not identify any new employees similarly situated to themselves. See Benson, 113 F.3d at 1211-12 (plaintiff-Benson raised jury question of pretext in part through evidence that new hire possessed skills equal to that of plaintiff) (emphasis added); Furr v. Seagate Technology, Inc., 82 F.3d 980, 986 (10th Cir. 1996) (reversing the district court's denial of defendant's motion for judgment as a matter of law because, among other reasons, "[p]laintiff's evidence of [employer's] post-RIF's hirings fail[ed] to show pretext because the people hired were not similarly situated to the [P]laintiffs"), cert. denied, 117 S. Ct. 684 (1997). Thus, while this superficial presentation may have satisfied plaintiffs' prima facie burden, it failed to support any inference of intentional age discrimination after Sverdrup explained the data in a plausible, age-neutral fashion. See Furr, 82 F.3d at 987 ("Statistical evidence which fails to properly take into account nondiscriminatory explanations does not permit an inference of pretext."); Doan v. Seagate Technology, Inc., 82 F.3d 974, 979 (10th Cir. 1996) (finding plaintiff's data that "a greater percentage of older workers were selected for the RIF while a greater percentage of younger people were hired afterwards" to be "flawed because it failed to

---

calculations must come from a witness, not a party's lawyer. See generally Fisher v. Asheville-Buncombe Technical College, 857 F. Supp. 465, 470 (W.D.N.C. 1993), aff'd, 25 F.3d 1039 (4th Cir. 1994) (per curiam).

compare similarly situated individuals and failed to eliminate nondiscriminatory reasons for the numerical disparities"), cert. denied, 117 S. Ct. 684 (1997); see generally Barnes v. Southwest Forest Indust., Inc., 814 F.2d 607, 608, 610 (11th Cir. 1987) (finding insufficient circumstantial evidence to support a prima facie case of failing to retain or rehire on the basis of age, even though employer discharged fourteen security guards in a RIF – thirteen of whom were over the age of forty – and hired twelve employees just before the RIF – only one of whom was over the age of forty).

Next, we find no substantial conflict in the evidence that Sverdrup implemented a bona fide RIF in November 1992. Watkins and Mallory rightfully point out that conventionally, a RIF results in "a shrinking of the work force." McCorstin, 621 F.2d at 754 (emphasis added). Sverdrup's TEAS operation, however, is unique because its existence hinges entirely on Air Force contracts. See generally Williams, slip op. at 3247, 3251 (employer's proffer that its losing a bid on "a government contract for the United States Army" caused the RIF constituted a legitimate, non-discriminatory reason for plaintiff's termination). According to the undisputed evidence at trial, the Air Force's new emphasis on inertial and satellite guided weapons systems and cancellation of ATLAS caused TEAS to hire engineers with new and distinct skills at the same time it discharged Watkins, Mallory and others with obsolete and outdated skills. Therefore, that TEAS experienced no net decrease, and T-60 experienced a slight increase, in

workforce in November 1992 amounted to no more than a scintilla of evidence to refute the notion that TEAS's management implemented a bona fide RIF.

Despite Watkins and Mallory's factually-naked contention to the contrary, Sverdrup did not "replace" them with new hires. The engineers that Sverdrup hired during the month of the RIF were critically skilled in areas that Watkins and Mallory were not, that is, aircraft integration, systems integration and product manufacturing. Significantly, Sverdrup did not hire a new seeker/sensor until September 1993, and he performed tasks involving optical train design, not infra-red or laser radar systems. See generally Benson, 113 F.3d at 1212 (The "availability of a job for which the plaintiff may be qualified eight months after an RIF is not proof that the same job existed at the time of the RIF."). Thus, plaintiffs' reliance on Clark is inapposite. See 990 F.2d at 1221, 1227 (rejecting employer's "attempt to cast [plaintiff's] termination as part of a reduction in force" because (1) "the number of employees at the . . . plant increased by 18 during [the month of the alleged RIF] and by two more" the following month, and (2) employer replaced plaintiff with younger individual who "actually had fewer responsibilities than" plaintiff).

Finally, just as Watkins and Mallory failed to rebut Sverdrup's case with affirmative evidence, they failed to impeach all of its legitimate, non-discriminatory reasons for including them in the RIF to the extent that a reasonable jury "could find them unworthy of credence." Combs, 106 F.3d at 1538. According to plaintiffs,

14

Sverdrup articulated the following explanations for including them in TEAS's RIF: (1) excessive amounts of nonproductive, or G-65, overhead time; (2) no long-term projected work; and (3) poor performance. Regarding G-65 time, Watkins and Mallory concede that their number ranked among the highest of T-60's engineers. That three engineers accumulated more nonproductive overhead time than Watkins is inconsequential; witnesses explained that two of these three engineers had long-term projected work and the other one had announced his impending resignation. Similarly, plaintiffs' evidence that their department director possessed exclusive control over their G-65 time, that is, whether their work was productive or unproductive, fell short of satisfying their pretext burden. They presented no evidence that Reid or any other director acted improperly, let alone with discriminatory animus. Cf. Williams, slip op. at 3249, 3251 (plaintiff raised jury question that RIF was a pretext for age discrimination in part through evidence that decision-maker told plaintiff, "[W]e have to come up with something to get rid of these older people who have been around for so long. We are about to have an RIF and we have go [sic] to get some older people to retire so we can save the jobs for the younger people.").

Nor did Watkins and Mallory sufficiently impeach the contention that TEAS possessed no long-term work for them at the time of the RIF. Unquestionably, Sverdrup hired plaintiffs in 1988 to perform seeker/sensor engineering tasks, namely, those involving infra-red and laser radar weapons systems. The Air Force, however, decreased

15

its demand for this type of work in 1992, as Watkins and Mallory recognized.[17]

Additionally, plaintiffs were not able to point to any other type of long-term projected work that they could perform just as well or better than the new hires. Both Watkins and Mallory testified that given their "extensive" backgrounds, they qualified for other positions within TEAS, and that Sverdrup's failure to transfer them evinced intentional age discrimination. Yet, plaintiffs' critique of the new hires' resumes did not account for the latter's unique skills and experiences in areas other than seeker/sensor technology, namely, aircraft integration, systems integration and product manufacturing. Nor were they able to refute evidence that consistent with its policy, TEAS management looked for, but found no, positions for which Watkins and Mallory were well-qualified. Lastly, to the extent that Watkins and Mallory purport to bootstrap prima facie "qualification" evidence to show pretext, case law from this circuit strongly belies its effectiveness. See Jameson v. Arrow Co., 75 F.3d 1528, 1533 (11th Cir. 1996) (In a RIF case, "[a]n employer's decision to transfer or to hire a younger employee for [an] available position [for which RIF'ed plaintiff applied and possessed qualifications] is sufficient evidence to support an inference of discrimination for the limited purpose of establishing the plaintiff's prima facie case[.]") (emphasis added).[18] In short, no reasonable jury could

---

[17] In fact, Watkins told a co-worker that he "was seriously thinking about retiring because there just wasn't enough work for him to do." Likewise, Mallory agreed with another seeker/sensor engineer's testimony that "work was on the decline."

[18] Because Watkins and Mallory did not sufficiently discredit all of Sverdrup's proffered legitimate, non-discriminatory reasons for including them in the RIF, we need not discuss Sverdrup's other proffered reasons, namely plaintiffs' poor performance. See supra note 11. Of

16

find that Sverdrup's including plaintiffs in the RIF was anything other than "a business

decision, and the ADEA is not a vehicle for reviewing the propriety of business

decisions."  Furr, 82 F.3d at 986 (citation and internal quotation marks omitted).

---

course, that Watkins and Mallory performed competently would not, in and of itself, create a jury question.  See Broaddus, slip op. at 3349 ("[T]he ADEA prohibits age discrimination and age discrimination alone.") (citation omitted); Earley, 907 F.2d at 1083 ("The essence of a RIF is that competent employees who in more prosperous times would continue and flourish at a company may nevertheless have to be fired.") (citation, internal quotation marks and alterations omitted).

## V. CONCLUSION

For the foregoing reasons, we hold that no reasonable jury could find that Sverdrup discharged Watkins and Mallory from employment on account of their age. Accordingly, we affirm the judgment of the district court.[19]

**AFFIRMED.**

---

[19] Because of our disposition on his ADEA claim, Mallory's appeal of the district court's pretrial dismissal of his state law age discrimination claim is moot. See Zaben v. Air Products & Chemicals, Inc., 129 F.3d 1453, 1455 n.2 (11th Cir. 1997) ("Age discrimination claims brought under the Florida Civil Rights Act have been considered within the same framework used to decide actions brought pursuant to the ADEA.") (per curiam).