In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3703

VICKI G. PALUCK,

Plaintiff-Appellant,

v.

GOODING RUBBER COMPANY,

Defendant-Appellee.


Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 C 2564--Harry D. Leinenweber, Judge.


Argued April 6, 2000--Decided July 26, 2000


Before POSNER, Chief Judge, and FLAUM and RIPPLE,
Circuit Judges.

RIPPLE, Circuit Judge. Vicki Golden Paluck was
employed by the Gooding Rubber Company
("Gooding") from November 1987 until her
termination in January 1997. Ms. Paluck alleges
that she was terminated in violation of Title
VII, 42 U.S.C. sec. 2000e et seq., as retaliation
for filing a sexual harassment complaint against
her supervisor. Further, she claims that she was
terminated because of her age, in violation of
the Age Discrimination in Employment Act
("ADEA"), 42 U.S.C. sec. 12101 et seq. The
district court granted Gooding's motion for
summary judgment, and she now appeals. For the
reasons set forth in the following opinion, we
affirm the judgment of the district court.
I
BACKGROUND
A.

Vicki Golden Paluck began her career at Gooding
in 1987 as a purchasing clerk. She worked at the
company's facility in LaGrange, Illinois./1 In
1991, she became a receptionist, and in 1992 she
became an administrative assistant/executive
secretary. She worked primarily for three Gooding
executives: John Mork, Kim Heis, and David
Lawrence. Ms. Paluck admits that, during her
employment with Gooding, she had some attendance
problems and that Mork and Heis repeatedly spoke

to her about her tardiness and her unproductive use of time.

In January 1996, Heis, Gooding's Operations Manager, met with Ms. Paluck and rescinded a raise he had given her the previous April. In rescinding the raise, he told Ms. Paluck that he did not think that her performance had improved and, further, that he thought she had been making more personal phone calls than before. That same day, Heis also reduced the salary of Paulette Miles, a coworker of Ms. Paluck's. Ms. Paluck and Miles believed that Heis' actions were an effort to induce them to leave Gooding because they were aware of Heis' alleged affair with another employee.

Less than 10 days later, Ms. Paluck and Miles requested a meeting with Mork, the company president, to allege sexual harassment by Heis. In response to the request, Mork met with Ms. Paluck and Miles separately. Ms. Paluck and Miles alleged that Heis frequently made vulgar comments and used sexually explicit language. The January 1996 meeting was the first time Ms. Paluck had raised allegations of sexual harassment, although the incidents she cited dated back as far as 1989. Mork told Ms. Paluck that he would investigate her complaints. He then spoke to Heis about his conduct, and Heis responded with a memorandum defending himself.

Mork later summarized his findings regarding the allegations against Heis in a February memorandum. In his memorandum, he determined that some of Heis' statements were inappropriate and that some had been misinterpreted. Mork reinstated Ms. Paluck to her previous pay level, and also took her off of the probation on which Heis had placed her. Mork also listed three "[d]isciplinary actions" taken against Heis: he was to cease the actions and comments alleged by Ms. Paluck and Miles; he was to become "more sensitive to the feelings of others" and to "refrain from making inappropriate comments or statements that can be misconstrued"; finally, he was warned that "[i]f any harassment occurs in the future additional disciplinary measures will be taken." R.37, Ex.3. Mork also wrote that Ms. Paluck would report directly to him and that he would handle performance reviews, although she would still report to Heis when Mork was out of the office. Mork also spoke to Ms. Paluck and told her that he would continue to meet with her to follow up on her complaints, but she now claims that he did not follow through on this promise.

Miles voluntarily resigned on March 8, 1996. On March 15, she was replaced by a woman named Tracy

Herring. Ms. Paluck says that she and Herring frequently shared duties in the office.

In October, Mork informed the clerical staff that he would be out of the office a great deal and that they should report to Heis in his absence. After Mork's announcement, Ms. Paluck expressed to Mork her reservations about working closely with Heis. In November, Heis sent Ms. Paluck a memorandum, copied to Mork, expressing concern with Ms. Paluck's attendance and with the amount of time she spent on personal phone calls. Ms. Paluck's written response acknowledged problems with her attendance and tardiness but indicated her belief that she was being treated unfairly. In that response she also asked if Heis' memo was a written warning and if she should expect further disciplinary action. In a reply memorandum, Heis reiterated his concerns about Ms. Paluck's performance. He further confirmed that his first memorandum had been a written warning and that management retained the discretion to commence disciplinary action.

Soon thereafter Gooding suffered a financial blow. One of Gooding's largest clients was United States Steel ("USX"). Gooding had contracts to provide two product lines to USX, hoses and conveyor belts. Mork and other Gooding employees met with USX representatives in December. On January 2, 1997, USX informed Mork that it would no longer purchase hoses from Gooding. Mork then sent a memo to employees stating that "the long association between Gooding Rubber Company and USX is ending." R.37, Ex.9. Gooding continued to supply USX with conveyor belts. However, its sales to USX dropped from approximately $1.6 million in 1996 to $650,000 in 1997.

On January 3, Gooding terminated Ms. Paluck's employment. At the time she was 41 years old. Mork wrote a memorandum for Ms. Paluck's personnel file that read, "Effective today, Ms. Golden [Paluck] was layed [sic] off. The reason for this action is because of the loss of a significant customer and lower than expected revenues in 1996." R.37, Ex.10. Gooding subsequently laid off several other employees, although it retained Herring, then 26 years old, who took over at least some of Ms. Paluck's duties.

B.

Ms. Paluck then brought this lawsuit. In her complaint, she alleges that Gooding violated Title VII by terminating her in retaliation for her sexual harassment complaints against Heis. Further, her complaint alleges that Gooding discriminated against her because of her age, in

violation of the ADEA, when it chose to terminate her and retain Herring.

At the close of discovery in the district court, the court set a briefing schedule on Gooding's motion for summary judgment. After Gooding filed its motion, Ms. Paluck responded and also filed her own motion for summary judgment. The district court struck Ms. Paluck's motion for summary judgment as untimely filed. The district court then granted Gooding's motion for summary judgment. It determined that Ms. Paluck had not made out a prima facie case of retaliatory discharge because she could not show that her discharge was caused by her engagement in protected activity. Further, it concluded that, even if she had made a prima facie case of retaliatory discharge, she had not demonstrated that Gooding's stated reason for her discharge was pretextual. The district court also granted summary judgment for Gooding on Ms. Paluck's age discrimination claim, determining that she had failed to show that a similarly-situated younger employee had been treated more favorably./2

II
DISCUSSION

We review de novo the district court's grant of summary judgment for Gooding. See Williams v. Chartwell Fin. Servs., 204 F.3d 748, 752 (7th Cir. 2000); Tobey v. Extel/JWP, Inc., 985 F.2d 330, 332 (7th Cir. 1993). In doing so, we view the record in the light most favorable to Ms. Paluck, drawing all reasonable inferences in her favor. See Krocka v. City of Chicago, 203 F.3d 507, 513 (7th Cir. 2000); Boulahanis v. Board of Regents, 198 F.3d 633, 636 (7th Cir. 1999), cert. denied, 120 S. Ct. 2762 (2000). Summary judgment is appropriate only when no genuine issue of triable fact exists regarding a material issue. See Williams, 204 F.3d at 752; Krocka, 203 F.3d at 513.

A.  Title VII

Because she has presented no direct evidence of discrimination, Ms. Paluck's claim of retaliatory discharge under Title VII must proceed under the burden-shifting method set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). First, Ms. Paluck must make a prima facie case of retaliatory discharge. The prima facie case includes three elements: (1) that she engaged in statutorily-protected expression by complaining about discrimination covered by Title VII; (2) that she suffered an adverse job action; and (3) that there is a causal link between the protected expression and the adverse job action. See Miller v. American Family Mut. Ins. Co., 203 F.3d 997,

1007 (7th Cir. 2000); Sauzek v. Exxon Coal USA, Inc., 202 F.3d 913, 918 (7th Cir. 2000). After a prima facie case has been made, the employer, to avoid liability, is obligated to produce a legitimate, non-retaliatory reason for the dismissal. See Sanchez v. Henderson, 188 F.3d 740, 746 (7th Cir. 1999), cert. denied, 120 S. Ct. 1201 (2000). Once the employer has produced its legitimate reason, the employee, to succeed in her claim, must rebut the employer's proffered reason by demonstrating that it is a mere pretext for discrimination. See Miller, 203 F.3d at 1007; Sanchez, 188 F.3d at 746.

Gooding contends that Ms. Paluck has failed to make out a prima facie case because she cannot show that her protected conduct, making an allegation of sexual harassment against Heis, caused her termination. Ms. Paluck, however, points to two considerations that she claims show the requisite causation: (1) the timing of her termination, and (2) the reception by Mork (the decision-maker) of copies of Heis' memoranda criticizing her work. We address each of these matters in turn.

1.

Ms. Paluck believes that the timing of her firing gives rise to an inference of discrimination. It is true that the timing of an employee's discharge may be circumstantial evidence of a retaliatory motive. See Stagman v. Ryan, 176 F.3d 986, 1001 (7th Cir. 1999), cert. denied, 120 S. Ct. 446 (1999); Hunt-Golliday v. Metropolitan Water Reclamation Dist., 104 F.3d 1004, 1011 (7th Cir. 1997). However, in order to support an inference of retaliatory motive, the termination must have occurred "fairly soon after the employee's protected expression." Davidson v. Midelfort Clinic, Ltd., 133 F.3d 499, 511 (7th Cir. 1998). Here, the protected expression, Ms. Paluck's sexual harassment complaint, occurred nearly a full year before her termination. That interval, standing alone, is too long for the timing of Ms. Paluck's firing to raise an inference of discrimination. See Adusumilli v. City of Chicago, 164 F.3d 353, 363 (7th Cir. 1998) (eight month interval too long), cert. denied, 120 S. Ct. 450 (1999); Davidson, 133 F.3d at 511 (five months); Juarez v. Ameritech Mobile Communications, Inc., 957 F.2d 317, 321 (7th Cir. 1992) (six months). Of course, the fact that a year passed between Ms. Paluck's protected expression and her termination does not mean that she cannot prove that retaliation caused her discharge; instead, it means that the timing of her discharge, in itself, does not support an inference of retaliation, and she must come forward with other evidence. See Davidson, 133

F.3d at 511; Veprinsky v. Fluor Daniel, Inc., 87 F.3d 881, 891 n.6 (7th Cir. 1996).

Ms. Paluck claims, however, that there is another dimension to the timing of her discharge that supports her claim of discrimination: she was terminated the day after Gooding announced its loss of business from USX. She was the first employee to be terminated after the announcement, and, she claims, Gooding was "just waiting for an excuse" to fire her. Appellant's Br. at 22. We believe that this assertion adds nothing significant to her argument that the timing of her discharge is suspicious. In considering whether the timing of an adverse employment action gives rise to an inference of discrimination, the critical inquiry is, as we have just noted, the time lapse between the adverse action and the protected expression. See Davidson, 133 F.3d at 511; McClendon v. Indiana Sugars, Inc., 108 F.3d 789, 796-97 (7th Cir. 1997); McKenzie v. Illinois Dep't of Transp., 92 F.3d 473, 485 (7th Cir. 1996). At the time of her dismissal, her protected action had occurred almost a year earlier. We thus decline to infer retaliatory motive from the timing of Gooding's actions against her.

Ms. Paluck further submits that the timing of her firing is suspicious because it came shortly after she was returned to Heis' supervision. This argument, however, is not based on an entirely accurate portrayal of the record. Ms. Paluck was not returned to Heis' supervision in October. When Mork wrote his February 1996 memorandum summarizing the "[d]isciplinary action" against Heis, he nonetheless informed all parties that in his absence, Ms. Paluck would report to Heis. R.37, Ex.3. In October, Mork informed the office staff that "he would be out of the office a great deal, and that they should all report to Heis in his absence." Appellant's Br. at 9. Thus, the record reflects that at all times after she filed her sexual harassment complaint, Ms. Paluck reported to Mork. Ms. Paluck, along with the rest of the office staff addressed in Mork's directive, simply reported to Heis when Mork was out of the office. There is no contention that Heis, the company's operations manager, was not the individual to whom it might be expected that general responsibility for the office staff would be delegated in Mork's absence.

2.

We next consider whether any reliance by Mork on Heis' memoranda criticizing Ms. Paluck's performance raises an inference of discrimination. Normally, statements by a nondecisionmaker do not satisfy a plaintiff's

burden of proof in an employment discrimination case. See Eiland v. Trinity Hosp., 150 F.3d 747, 751 (7th Cir. 1998); Larimer v. Dayton Hudson Corp., 137 F.3d 497, 500 n.4 (7th Cir. 1998). However, if a manager with a retaliatory motive is involved in the decision to terminate an employee, that retaliatory motive, in some circumstances, may be imputed to the company, even if the manager with a retaliatory motive was not the ultimate decisionmaker. See Dey v. Colt Constr. Co., 28 F.3d 1446, 1459 (7th Cir. 1994) (collecting cases).

We assume for purposes of the following discussion that Mork did rely on Heis' memoranda. Nevertheless, we do not think that, on this record, any desire for retaliation on Heis' part may be imputed to Gooding because of Heis' memoranda. In Heis' memoranda, he made two allegations about Ms. Paluck's behavior: that she had problems with attendance and tardiness, and that she spent too much time on personal phone calls. In Ms. Paluck's response to Heis' charges against her, she conceded that his first allegation was accurate, and she did not rebut his second allegation. In this court, she does not deny the truth of Heis' allegations. Ms. Paluck's filing of a discrimination complaint does not prevent her employer from issuing written charges against her when her conduct warranted disciplinary action. See Glover v. South Carolina Law Enforcement Div., 170 F.3d 411, 414 (4th Cir. 1999) ("[E]mployees [may not] immunize improper behavior simply by filing [a discrimination] complaint. . . . Employers retain, as they always have, the right to discipline or terminate employees for any legitimate, nondiscriminatory reason."), cert. denied, 120 S. Ct. 1005 (2000); Brown v. Ralston Purina Co., 557 F.2d 570, 572 (6th Cir. 1977) ("[A discrimination] complaint creates no right on the part of an employee to miss work, fail to perform assigned work, or leave work without notice."). Because it is undisputed that Ms. Paluck's actions justified disciplinary measures, we do not think a discriminatory motive reasonably may be inferred from Heis' taking such measures. Thus, even if Mork did rely on Heis' memoranda to terminate Ms. Paluck, no reasonable finder of fact could conclude that his decision to do so created a situation in which retaliatory motive caused Ms. Paluck's dismissal./3

Ms. Paluck has not provided evidence from which a reasonable finder of fact could determine that a desire to retaliate against her motivated her termination. Thus, she has not made out a prima facie case of retaliatory discharge. Because we hold that Ms. Paluck has failed to make a prima facie case, we need not address the question of

whether Gooding's stated reason for the termination was in fact a pretext for a retaliatory motive. See Cowan v. Glenbrook Security Servs., Inc., 123 F.3d 438, 445 (7th Cir. 1997) ("We need not reach the issue of pretext, as plaintiff has failed to state a prima facie case of discriminatory discharge under McDonnell Douglas."); Lewis v. Gillette Co., 22 F.3d 22, 25 (1st Cir. 1994) (per curiam)./4 We now consider Ms. Paluck's claim of age discrimination.

B. ADEA
1.

Ms. Paluck's age discrimination claim also proceeds under the McDonnell Douglas burden shifting method. Here, both parties agree that after her discharge, Ms. Paluck's duties were absorbed by other employees./5 Therefore, to make a prima facie case for age discrimination, Ms. Paluck must show that: (1) she was a member of the protected class; (2) she was qualified for her position; and (3) she was discharged while other, similarly-situated employees who were not members of the protected class were treated more favorably. See Thorn v. Sundstrand Aerospace Corp., 207 F.3d 383, 386 (7th Cir. 2000); Bellaver v. Quanex Corp., 200 F.3d 485, 493-94 (7th Cir. 2000).

The district court concluded that Ms. Paluck had failed to establish a prima facie case. The first two elements of the prima facie case are not in dispute: Ms. Paluck was over 40 and thus a member of the protected class, and she suffered an adverse employment action. At issue is the third element. The district court determined that, because Ms. Paluck and Herring held different positions, they were not similarly situated employees. It is not dispositive, however, that Ms. Paluck and Herring had performed different work while both were employed by Gooding. What must be considered is whether Ms. Paluck was "constructively replaced" by employees not in the protected class. Bellaver, 200 F.3d at 495. In this case, Ms. Paluck contends that she was replaced constructively by Herring.

Herring testified at her deposition that she became responsible for much of the work previously performed by Ms. Paluck:
I kind of acquired, I should say, the things that she used to do as far as typing proposals and quotations for the salesmen, retrieving the EDI daily, things like that, things of that nature. R.33, Ex.D at 24. Counsel asked Herring, "So basically all of the things that Vicki [Paluck] did you took over?" Id. at 25. Herring responded, "Yes, but we no longer used the dictaphone." Id.

Gooding contends that Ms. Paluck was "a department unto herself" at the company, Appellee's Br. at 28, and that, after her termination, her duties were dispersed among several employees. Mork testified at his deposition that Ms. Paluck's duties were redistributed among numerous employees, including senior executives who began doing their own typing. According to Gooding, much of Ms. Paluck's work was absorbed by employees who were members of the ADEA's protected class.

On this record, we believe that it reasonably may be concluded that Herring effectively replaced Ms. Paluck. The fact that their job titles were different is not dispositive. See Bellaver, 200 F.3d at 494. Thus, we are not bound by Gooding's classification of Ms. Paluck as "a department unto herself." Our focus instead is on the fungibility of the employees' positions. See Miller v. Borden Inc., 168 F.3d 308, 313 (7th Cir. 1999); Gadsby v. Norwalk Furniture Corp., 71 F.3d 1324, 1331 (7th Cir. 1995). Further, "the fungibility of jobs is implicit when the terminated employee's responsibilities are absorbed by other employees." Gadsby, 71 F.3d at 1331. Herring testified that she took over all of Ms. Paluck's duties, other than dictation, which was no longer performed. Although there is evidence in the record from which it could be concluded that Herring did not actually replace Ms. Paluck, we cannot say that there is no disputed issue of fact on this question. Thus, we shall proceed on the basis that Ms. Paluck has established a prima facie case of age discrimination.

2.

Gooding's stated reason for the discharge is a reduction in force ("RIF"). Ms. Paluck may show pretext by demonstrating that Gooding did not honestly believe that a RIF was the reason she was fired and that age tipped the balance in favor of her discharge. See Pitasi v. Gartner Group, 184 F.3d 709, 718 (7th Cir. 1999). Pretext may be shown by demonstrating that the reduction in force was an excuse to get rid of workers belonging to the protected group. See Matthews v. Commonwealth Edison Co., 128 F.3d 1194, 1197 (7th Cir. 1997). Even if the reduction was otherwise bona fide, a plaintiff may show pretext by demonstrating that the specific reasons given for including her in the reduction were pretextual. See Watkins v. Sverdrup Tech., Inc., 153 F.3d 1308, 1316-17 (11th Cir. 1998); Benson v. Tocco, Inc., 113 F.3d 1203, 1209-10 (11th Cir. 1997). To show pretext, Ms. Paluck must show that Gooding did not honestly believe the reasons it gave for

her termination. See Pitasi, 184 F.3d at 718; Roberts v. Separators, Inc., 172 F.3d 448, 453 (7th Cir. 1999).

a.

Ms. Paluck argues that the entire reduction in Gooding's workforce was a pretext for age discrimination. She claims that, because Gooding lied about the extent of the business it was about to lose, it was lying about its need for a RIF. Further, she says, the fact that the RIF disproportionately affected older workers indicates that it was an excuse to eliminate older employees.

Ms. Paluck must show that Gooding was lying when it said that a loss of USX business motivated it to reduce its payroll. Ms. Paluck's obligation to show pretext requires her to show that Gooding offered a "phony reason for some action." Green v. National Steel Corp., 197 F.3d 894, 899 (7th Cir. 1999); Russell v. Acme-Evans Co., 51 F.3d 64, 68 (7th Cir. 1995). The action here was the reduction in its workforce; the reason given for that reduction was the loss of USX business. Ms. Paluck concedes that Gooding lost a substantial portion of its USX business and that a loss of business is a legitimate reason to lay off employees. Although the record is devoid of any evidence indicating that the savings realized through layoffs corresponded to the loss of business experienced by Gooding, Ms. Paluck has not argued that the RIF was too far reaching to cover the anticipated loss of business.

Ms. Paluck argues that Gooding lied about how much business it lost when USX did not renew its contract. More precisely, she points out that, in explaining to all of the company's employees that the company faced difficult times because of the loss of USX business, Mork did not disclose that the company, although losing its hose business, would retain the conveyor belt business. Yet, the fact remains that Ms. Paluck simply is unable to show that Gooding did not honestly believe that the anticipated loss of its revenue from USX did not require the reduction in staff that the company undertook. Indeed, she acknowledges that the loss of some USX business may have been sufficient for the company to initiate layoffs. Ms. Paluck has made no showing, in her effort to establish pretext, that Gooding did not exercise honest business judgment in determining that personnel cuts of this magnitude were an appropriate business response to the situation it faced.

Ms. Paluck claims that Gooding did not actually undertake a RIF at its LaGrange plant because it

continued to hire employees even as the RIF was supposedly in progress. Evidence that an employer continued hiring during a purported RIF may suggest that the RIF was pretextual. See Pierce v. Atchison, Topeka & Santa Fe Ry. Co., 65 F.3d 562, 573 (7th Cir. 1995). In support of this argument, Ms. Paluck refers to a record document listing Gooding's hirings and terminations in 1997. Ms. Paluck has not explained with any specificity how this document supports her assertion that no actual RIF took place. Without an explanation from Ms. Paluck, our ability to interpret this document is limited./6 From our own review of the document, we do not think that it necessarily supports Ms. Paluck's argument that Gooding was taking on full-time employees during its purported RIF. During 1997, Gooding terminated 17 people at its LaGrange facility who had worked for the company prior to 1997. Gooding also hired 11 people at LaGrange during 1997 who remained with the company at the end of the year./7 The terminations occurred almost exclusively in the first half of the year, right after Gooding lost its hose business with USX; almost all of the hirings, in contrast, took place in the second half of the year./8 The document does not distinguish between full-time and part-time employees, or describe any of the duties performed by the discharged employees. Nor does it contain salary data. From this document alone it cannot reasonably be inferred that Gooding continued hiring new employees in the midst of its purported RIF. The burden was on Ms. Paluck to show that Gooding's RIF was pretextual because it continued hiring new employees during its purported RIF, and these unexplained statistics do not demonstrate pretext.

Finally, we cannot conclude that the RIF was a pretext for age discrimination solely because the RIF disproportionately affected employees protected by the ADEA. "Our court generally has not found that statistical evidence concerning terminated employees, without more, is relevant to our analysis of whether the articulated reasons for discharging [a] plaintiff were pretextual or discriminatory." Adreani v. First Colonial Bankshares Corp., 154 F.3d 389, 400 (7th Cir. 1998); see also Testerman v. EDS Tech. Prods. Corp., 98 F.3d 297, 305 (7th Cir. 1996). As we have discussed, Ms. Paluck has offered no other evidence to show that Gooding could not properly undertake a RIF. Thus, we conclude that Ms. Paluck has not shown that Gooding's decision to undertake a RIF was a pretext for age discrimination.

b.

We next consider whether Ms. Paluck was properly

included in the RIF. Even if Gooding's RIF had a legitimate purpose, summary judgment would be inappropriate if Ms. Paluck can show that Gooding's reasons for including her in the RIF were pretextual. See Watkins, 153 F.3d at 1316-17; Benson, 113 F.3d at 1209-10. Gooding's proffered explanation for including her in the RIF is that Mork did not think he could justify keeping an executive secretary, and he wanted to show leadership in making budget cuts. We must decide whether there are facts in the record suggesting that Gooding did not honestly believe this reason. See Jordan v. Summers, 205 F.3d 337, 343 (7th Cir. 2000); Roberts, 172 F.3d at 453.

The basic methodology of Gooding in conducting the RIF is discernable from the record. Decision-making responsibility was vested in the company's president rather than, as is often the case, a committee. However, he consulted subordinate managers before making decisions. Gooding says that, in making decisions, Mork looked at "whose job functions were affected by the impact of the loss of the USX business" and "other factors." R.33 at 10. More precise and objective criteria may have been possible. The "even-handed application of . . . objective criteria" is an indication that discrimination was not present. Cable v. Ivy Tech State Coll., 200 F.3d 467, 478 (7th Cir. 1999). Nonetheless, any lack of precision in the articulated standards does not mean that Ms. Paluck's inclusion in the RIF was necessarily a pretext for age discrimination. See Bashara v. Black Hills Corp., 26 F.3d 820, 825 (8th Cir. 1994) (lack of objective criteria does not show that RIF was motivated by discrimination when other evidence shows that RIF was bona fide). The dispositive question is whether Ms. Paluck has shown that Gooding's stated reason for including her in the RIF--that Mork sought to show leadership by eliminating the executive secretary position--was pretextual.

Ms. Paluck argues that discriminatory intent is shown by the fact that she was fired January 3, 1997, the day after the reduction in business from USX was announced. She points out that no other employees were terminated for several weeks after her firing. However, Mork's later consultations and decisions do not show that his reason for terminating Ms. Paluck was pretextual. In evaluating whether Gooding's stated reason is pretextual, we must consider whether Gooding honestly believed that reason "at the time of [Ms. Paluck's] discharge." Michas, 209 F.3d at 695; cf. Cullen v. Olin Corp., 195 F.3d 317, 324 (7th Cir. 1999) (finding that district court abused its discretion by admitting evidence of post-RIF job performance that "had no bearing on management's state of mind at the time the decision to terminate [the plaintiff] was made"),

cert. denied, 120 S. Ct. 1423 (2000). No evidence in the record suggests that, on January 3, 1997, Mork did not honestly believe that Gooding needed to cut costs and that he should show leadership by terminating his own executive secretary. Thus, Ms. Paluck has not shown pretext.

Conclusion

For the foregoing reasons, the judgment of the district court is affirmed./9

AFFIRMED


/1 The LaGrange facility was the largest of Gooding's four locations; as of December 1996, 50 of the company's 80 employees worked there. The company's 1996 sales were approximately $23 million.

/2 Ms. Paluck contends that the district court improperly struck facts from her Rule 12 statements without explanation. In ruling on Gooding's motion to strike certain facts, the district court stated that it would "only resolve objections to statements that are material to the present claim" to avoid resolving disputes over irrelevant or unnecessary facts. R.47 at 2. The district court provided a summary of the facts but did not say that it had struck any of the facts in Ms. Paluck's Rule 12 statements. Because the district court said that it would explain its decision to strike any facts and then offered no explanation for striking any facts, we may assume that no facts were struck. Further, on appeal we have considered the entire record without striking any facts put forward by Ms. Paluck.


/3 Ms. Paluck also contends that Heis was involved in the decisionmaking process based on a conversation he had with Mork prior to Ms. Paluck's being informed of her termination. However, in the testimony cited by Ms. Paluck, Heis said only that Mork informed him of Ms. Paluck's termination before informing her.

/4 We note that we reach the issue of pretext in considering Ms. Paluck's age discrimination claim. In analyzing that claim, we conclude that Ms. Paluck is unable to show pretext.

/5 When a terminated employee's duties were absorbed by other employees, rather than eliminated from the company altogether, we do not require the former employee plaintiff to make out the prima facie case normally required for reduction in force cases. See Michas v. Health Cost Controls of Ill., Inc., 209 F.3d 687, 693-94 (7th Cir.

2000). For purposes of deciding the proper prima facie case requirements to apply, our inquiry is dependent not on the number of employees terminated, but "on whether [Gooding] still needed [Ms. Paluck's] job responsibilities to be performed." See id. at 694. Thus, when a particular terminated employee's duties still were performed by employees of the company, as they were here, the reduction in force prima facie case standard is inappropriate even if the company terminated numerous other employees.

/6 See Anderson v. Douglas & Lomason Co., 26 F.3d 1277, 1295 (5th Cir. 1994) ("[O]ur review of the record has been unduly hampered by the plaintiffs' failure to establish whether their statistics were meaningful or significant in light of the particular facts of this case."); cf. Plemer v. Parsons-Gilbane, 713 F.2d 1127, 1138 (5th Cir. 1983) ("[The plaintiff] has the burden to give her raw statistics relevance and meaning by accounting for basic factors likely to affect the evidence's probative value." (quotations and citation omitted)).

/7 Seven people were hired during 1997 and then terminated during the same year. Five of the seven worked at Gooding for less than a month. Another one was listed as having been hired December 15, 1997, but terminated October 14, 1997.

/8 Not including employees who served less than a month with the company, 14 of the 17 terminations took place on May 14 or earlier, and two more occurred before June 30. All 11 people hired who remained with the company at the end of the year were hired May 21 or later, and eight of the 11 were hired October 7 or later.

/9 Ms. Paluck argued that the district court improperly struck her motion for summary judgment. The decision to strike a motion is generally committed to the discretion of the district court. See Maldonado v. U.S. Bank, 186 F.3d 759, 768 (7th Cir. 1999). Even if the district court abused its discretion in striking Ms. Paluck's motion, our own de novo review of the record convinces us that summary judgment for Gooding is appropriate and, consequently, that summary judgment for Ms. Paluck would be improper.